UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

PATRICK TRACY,

                          Plaintiff,

          -v.-                                  5:01-CV-0500
                                                     (HGM/GHL)

PARKER J. FRESHWATER; TOMPKINS
COUNTY, Tompkins County Sheriff's Department;
PETER MESKILL, Tompkins County Sheriff,

                          Defendants.
_____

APPEARANCES:                               OF COUNSEL:

PATRICK TRACY, 06499-028
  Plaintiff, *Pro Se*
Federal Prison Camp
P.O. Box 12014
Terre Haute, IN  47801

HON. JONATHAN WOOD                        JONATHAN WOOD, ESQ.
County Attorney, Tompkins County
  Counsel for Defendants
125 East Court Street
Tompkins County Office Building
Ithaca, NY  14850

GEORGE H. LOWE, UNITED STATES MAGISTRATE JUDGE

## REPORT-RECOMMENDATION

_____This matter has been referred to me for Report and Recommendation by the Honorable

Howard G. Munson, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and

Local Rule N.D.N.Y. 72.3(c).  In this *pro se* civil rights complaint brought under 42 U.S.C. §§

1983 and 1988, Inmate Patrick Tracy ("Plaintiff") asserts claims of excessive force and battery

against Tompkins County Deputy Sheriff Parker J. Freshwater, and claims of negligence and

vicarious liability against Tompkins County Sheriff Peter Meskill, and Tompkins County, in violation of Plaintiff's rights under the Fourth, Fifth, Thirteenth and Fourteenth Amendments, arising out of an incident occurring on April 8, 2000, during which Defendant Freshwater allegedly used excessive force to effect an arrest of Plaintiff.  (Dkt. No. 1.)

Currently before the Court is Defendants' motion for summary judgment.  (Dkt. No. 58.) Generally, Defendants' motion raises the following two issues: (1) whether all three Defendants are protected from liability by the doctrine of qualified immunity; and (2) whether Defendants Meskill and Tompkins County are protected from liability by the principles of limited liability for municipalities announced in *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and its progeny.[1]  (Dkt. No. 58, Part 9 [Defs.' Mem. of Law].)  For the reasons discussed below, I recommend that Defendants' motion for summary judgment be granted.

## I.    APPLICABLE LEGAL STANDARD

### A.    Summary Judgment

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In determining whether a genuine issue of material[2] fact exists, the Court must resolve all ambiguities and draw

---

[1]    *See, e.g., Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 691 (1978) ("[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents."); *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983) ("[A] [municipality] may not be held for the actions of its employees or agents under a theory of *respondeat superior*.").

[2]    A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

all reasonable inferences against the moving party.[3]

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).[4]  The nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts."[5] "A dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[6]

When deciding a motion for summary judgment, the facts set forth in a movant's Rule 7.1(a)(3) Statement of Material Facts will be taken as true to the extent those facts are supported

---

[3]      *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) [citation omitted]; *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990) [citation omitted].

[4]      *See also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986).

[5]      *Matsushita*, 475 U.S. at 585-86; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

[6]      *Ross v. McGinnis*, 00-CV-0275, 2004 WL 1125177, at *8 (W.D.N.Y. March 29, 2004) [internal quotations omitted] [emphasis added].

by the evidence in the record[7] and are not specifically controverted by the non-movant.[8]

Generally, a non-movant controverts the factual assertions in a movant's Rule 7.1 Statement

through a Rule 7.1 Response.[9]  This Rule 7.1 Response "shall mirror the movant's [Rule 7.1

Statement] by admitting and/or denying each of the movant's assertions in matching numbered

paragraphs.  Each denial shall set forth a specific citation to the record where the factual issue

arises."[10]  To the extent that a non-movant fails to file a proper Rule 7.1 Response, a district court

has no duty to perform an independent review of the record to find proof of a factual dispute.[11]

---

[7]      *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 243-245 (2d Cir. 2004) ("If the evidence submitted in support of the motion for summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented. . . . [I]n determining whether the moving party has met this burden . . . , the district court may not rely solely on the statement of undisputed material facts contained in the moving party's Rule 56.1 statement.  It must be satisfied that the citation to evidence in the record supports the assertion.") [citation omitted]; *see, e.g., Govan v. Campbell*, 289 F. Supp.2d 289, 295 (N.D.N.Y. Oct. 29, 2003) (Sharpe, M.J.) ("In this case, [the plaintiff] did not file a statement of undisputed facts in compliance with Local Rule 7.1(a)(3).  Consequently, the court will accept the *properly supported* facts contained in the defendants' 7.1 statement.") [emphasis added].

[8]      *See* N.D.N.Y. L.R. 7.1(a)(3) ("<u>Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.</u>").

[9]      *See* N.D.N.Y. L.R. 7.1(a)(3).

[10]      (*Id.*)

[11]      *See Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470 (2d Cir. 2002) ("We agree with those circuits that have held that Fed. R. Civ. P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") [citations omitted]; *accord, Lee v. Alfonso*, No. 04-1921, 2004 U.S. App. LEXIS 21432 (2d Cir. Oct. 14, 2004), *aff'g*, 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13 (N.D.N.Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak*, 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell*, 289 F. Supp.2d 289, 295 (N.D.N.Y. Oct. 29, 2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan*, 253 F. Supp.2d 369, 371-372 (N.D.N.Y. 2003) (Hurd, J.).

In the event the district court chooses to conduct such an independent review of the record, any verified complaint filed by the plaintiff should be treated as an affidavit.[12]

Here, I note that, although Plaintiff's Complaint does not contain a verification, it attaches a Notice of Claim that does contain a verification.  (Dkt. No. 1.)  Because exhibits to a pleading are deemed to be part of that pleading for all purposes under Rule 10(c) of the Federal Rules of Civil Procedure, I will treat the allegations in Plaintiff's Notice of Claim as sworn assertions.

In any event, to be sufficient to create a factual issue, an affidavit (or verified complaint) must, among other things, be based "on personal knowledge."[13]  An affidavit (or verified complaint) is not based on personal knowledge if, for example, it is based on mere "information and belief" or hearsay.[14]  In addition, such an affidavit (or verified complaint) must not be

---

[12]     *See Patterson v. County of Oneida*, 375 F.3d 206, 219 (2d. Cir. 2004) ("[A] verified pleading . . . has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson*, 251 F.3d 345, 361 (2d Cir. 2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied*, 536 U.S. 922 (2002); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") [citations omitted].

[13]     Fed. R. Civ. P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to the matters stated therein."); *see also U.S. v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.*, 44 F.3d 1082, 1084 (2d Cir. 1995) [citations omitted], *cert. denied sub nom*, *Ferrante v. U.S.*, 516 U.S. 806 (1995).

[14]     *See Patterson*, 375 F.3d at 219 ("[Rule 56(e)'s] requirement that affidavits be made on personal knowledge is not satisfied by assertions made 'on information and belief.'. . . [Furthermore, the Rule's] requirement that the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavits also means that the affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial."); *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988) ("[Defendant's] affidavit states that it is based on personal knowledge *or* upon information and belief . . . .  Because there is no way to ascertain which portions of [Defendant's]

conclusory.[15]  An affidavit (or verified complaint) is conclusory if, for example, its assertions

lack any supporting evidence or are too general.[16]  Moreover, "[a]n affidavit must not present

legal arguments."[17]  Furthermore, even where an affidavit (or verified complaint) is based on

personal knowledge and is nonconclusory, it may be insufficient to create a factual issue where it

is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with

inconsistencies and improbabilities that no reasonable juror would undertake the suspension of

---

affidavit were based on personal knowledge, as opposed to information and belief, the affidavit is insufficient under Rule 56 to support the motion for summary judgment."); *Applegate v. Top Assoc., Inc.*, 425 F.2d 92, 97 (2d Cir. 1970) (rejecting affidavit made on "suspicion . . . rumor and hearsay"); *Spence v. Maryland Cas. Co.*, 803 F. Supp. 649, 664 (W.D.N.Y. 1992) (rejecting affidavit made on "secondhand information and hearsay"), *aff'd*, 995 F. 2d 1147 (2d Cir. 1993).

[15]     *See* Fed. R. Civ. P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson*, 375 F.3d at 219 (2d. Cir. 2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate*, 425 F.2d at 97 (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

[16]     *See, e.g.*, *Bickerstaff v. Vassar Oil*, 196 F.3d 435, 452 (2d Cir. 1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.*, 78 F.3d 61, 63 (2d Cir. 1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon*, 759 F.2d 989, 997 (2d Cir. 1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places. . . .  It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e]), *cert. denied*, 474 U.S. 829 (1985); *Applegate*, 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

[17]     N.D.N.Y. L.R. 7.1(a)(2).

6

disbelief necessary to credit the allegations made in the complaint."[18]

### B.   Revocation of Plaintiff's Special Status as *Pro Se* Civil Rights Litigant

Imposed over the aforementioned burden-shifting framework is the generous perspective

with which the Court *generally* views a *pro se* civil rights plaintiff's papers.[19]  For example,

where a civil rights plaintiff is proceeding *pro se*, and the defendant has filed a dispositive

motion, *generally* the Court must construe the plaintiff's complaint and opposition papers

---

[18]     *See, e.g.*, *Jeffreys v. City of New York*, 426 F.3d 549, 554-555 (2d Cir. 2005)
(affirming grant of summary judgment to defendants in part because plaintiff's testimony about
an alleged assault by police officers was "largely unsubstantiated by any other direct evidence"
and was "so replete with inconsistencies and improbabilities that no reasonable juror would
undertake the suspension of disbelief necessary to credit the allegations made in the complaint")
[citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45
(2d Cir. 1986) (affirming grant of summary judgment to defendants in part because plaintiffs'
deposition testimony regarding an alleged defect in a camera product line was, although specific,
"unsupported by documentary or other concrete evidence" and thus "simply not enough to create
a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner*, 03-CV-3789,
2006 WL 357824, at *3-4 & n.7, 14, 16, 21 (S.D.N.Y. Feb. 15, 2006) (prisoner's verified
complaint, which recounted specific statements by defendants that they were violating his rights,
was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact
with regard to all but one of prisoner's claims, although verified complaint was sufficient to
create issue of fact with regard to prisoner's claim of retaliation against one defendant because
retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose
testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia
Univ.*, 332 F. Supp.2d 599, 612 (S.D.N.Y. 2004) (plaintiff's deposition testimony was
insufficient evidence to oppose defendants' motion for summary judgment where that testimony
recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence
or benign"), *aff'd*, 136 F. App'x 383 (2d Cir. 2005) (unreported decision, cited not as
precedential authority but merely to show the case's subsequent history, in accordance with
Second Circuit's application of its Local Rule § 0.23).

[19]     *See Haines v. Kerner*, 404 U.S. 519, 520-21 (1972) (*per curiam* ) (*pro se* civil
rights action); *Ortiz v. Cornetta*, 867 F.2d 146, 148 (2d Cir. 1989) (*pro se* civil rights action);
*Aziz Zarif Shabazz v. Pico*, 994 F.Supp. 460,  467 (S.D.N.Y. 1998) (*pro se* civil rights action),
*aff'd in part*, *vacated in part on other grounds*, 205 F.3d 1324 (2d Cir. 2000) (unpublished
decision).

liberally so as to raise the strongest arguments that they suggest.[20]  Having said that,

"[p]roceeding pro se does not otherwise relieve a [party] from the usual requirements to survive a

motion for summary judgment."[21]

In addition, "[t]here are circumstances where an overly litigious inmate, who is quite

familiar with the legal system and with pleading requirements, may not be afforded [the] special

solicitude" or status that is normally afforded *pro se* litigants.[22]  Generally, the rationale for this

revocation of special status (at least in the Second Circuit) is not that the *pro se* litigant should be

punished but that his excessive litigiousness demonstrates his *experience*, the lack of which is the

reason for conferring the special status upon *pro se* litigants in the first place.[23]  Moreover,

---

[20]      *See Weixel v. Bd. of Ed. of City of New York,* 287 F.3d 138, 146 (2d Cir. 2002)
(motion to dismiss in civil rights case); *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)
(motion for summary judgment in civil rights case); *Thomas v. Irving,* 981 F. Supp. 794, 799
(W.D.N.Y. 1997) (motion for summary judgment in civil rights case).

[21]      *Bussa v. Aitalia Line Aeree Italiane S.p.A.*, 02-CV-10296, 2004 WL 1637014, at
*4 (S.D.N.Y. July 21, 2004) [citations omitted], *accord, Durran v. Selsky*, 251 F. Supp. 2d 1208,
1211 (W.D.N.Y. 2003) [citations omitted.  For example, although "[t]he work product of *pro se*
litigants should be generously and liberally construed, . . . [a *pro se* litigant's] failure to allege
either specific facts or particular laws that have been violated renders [an] attempt to oppose
defendants' motion ineffectual."  *Kadosh v. TRW, Inc.*, No. 91 Civ. 5080, 1994 WL 681763, at *5
(S.D.N.Y. Dec. 5, 1994).

[22]      *Smith v. Burge*, 03-CV-0955, 2006 WL 2805242, at *3 & n.3 (N.D.N.Y. Sept. 28,
2006) (Kahn, J., adopting report-recommendation of Lowe, M.J.) [citations omitted].

[23]      *See, e.g., Johnson v. Eggersdorf*, 8 F. App'x 140, 143 (2d Cir. 2001) (unpublished
opinion), *aff'g*, 97-CV-0938, Decision and Order (N.D.N.Y. filed May 28, 1999) (Kahn, J.),
*adopting*, Report-Recommendation, at 1, n.1 (N.D.N.Y. filed Apr. 28, 1999) (Smith, M.J.);
*Johnson v. C. Gummerson*, 201 F.3d 431, *2 (2d Cir. 1999) (unpublished opinion), *aff'g*, 97-CV-
1727, Decision and Order (N.D.N.Y. filed June 11, 1999) (McAvoy, J.), *adopting*, Report-
Recommendation (N.D.N.Y. filed April 28, 1999) (Smith, M.J.); *Davidson v. Flynn*, 32 F.3d 27,
31 (2d Cir. 1994); *Edwards v. Selsky*, 04-CV-1054, 2007 WL 748442, at *2-3 (N.D.N.Y. March
6, 2007) (Mordue, C.J., adopting Report-Recommendation of Lowe, M.J.); *Rolle v. Garcia*, 04-
CV-0312, 2007 WL 672679, at *4 (N.D.N.Y. Feb. 28, 2007) (Kahn, J., adopting Report-

permitting experienced *pro se* litigants to retain their special status (despite their litigation

experience) would tilt the scales of justice unfairly in favor of the *pro se* litigant and against his

opponents.[24]  As observed by Judge Irving R. Kaufman, of the Second Circuit, regarding an

active *pro se* litigant nearly 45 years ago:

---

Recommendation of Lowe, M.J.); *Mora v. Bockelmann*, 03-CV-1217, 2007 WL 603410, at *4
(N.D.N.Y. Feb. 22, 2007) (Mordue, C.J., adopting Report-Recommendation of Homer, M.J.);
*Brown v. Goord*, 04-CV-0785, 2007 WL 607396, at *2-3 (N.D.N.Y. Feb. 20, 2007) (McAvoy, J.,
adopting Report-Recommendation of Lowe, M.J.); *Mitchell v. Harriman*, 04-CV-0937, 2007 WL
499619, at *3 (N.D.N.Y. Feb. 13, 2007) (Sharpe, J., adopting Report-Recommendation of
Homer, M.J.); *Sledge v. Kooi*, 04-CV-1311, 2007 WL 951447, at *3-4 (N.D.N.Y. Feb. 12, 2007)
(Lowe, M.J.), *adopted by* 2007 WL 969576 (N.D.N.Y. March 28, 2007) (McAvoy, J.); *Gill v.
Pidylpchak*, 02-CV-1460, 2006 WL 3751340, at *2 (N.D.N.Y. Dec. 19, 2006) (Scullin, J.,
adopting Report-Recommendation of Treece, M.J.); *Saunders v. Ricks*, 03-CV-0598, 2006 WL
3051792, at *2 (N.D.N.Y. Oct. 18, 2006) (Hurd, J., adopting Report-Recommendation of Lowe,
M.J.); *Gill v. Frawley*, 02-CV-1380, 2006 WL 1742738, at *3 (N.D.N.Y. June 22, 2006)
(McAvoy, J., adopting Report-Recommendation of Lowe, M.J.); *Davidson v. Talbot*, 01-CV-
0473, 2005 U.S. Dist. LEXIS 39576, at *20 (N.D.N.Y. March 31, 2005) (Treece, M.J.), *adopted
by* 2006 U.S. Dist. LEXIS 47554 (N.D.N.Y. July 5, 2006) (Scullin, J.); *Gill v. Riddick*, 03-CV-
1456, 2005 U.S. Dist. LEXIS 5394, at *7 (N.D.N.Y. March 31, 2005) (Treece, M.J.); *Yip v. Bd.
of Tr. of SUNY*, 03-CV-0959, 2004 WL 2202594, at *3 (W.D.N.Y. Sept. 29, 2004); *Davidson v.
Dean*, 204 F.R.D. 251, 257 & n.5 (S.D.N.Y. 2001); *Santiago v. C.O. Campisi*, 91 F. Supp.2d
665, 670 (S.D.N.Y. 2000); *McGann v. U.S.*, 98-CV-2192, 1999 WL 173596, at *2 (S.D.N.Y.
March 29, 1999); *Hussein v. Pitta*, 88-CV-2549, 1991 WL 221033, at *4 (S.D.N.Y. Oct. 11,
1991).

[24]     *Edwards*, 2007 WL 748442, at *2; *Sledge*, 2007 WL 951447, at *3; *see also
Hussein*, 1991 WL 221033, at *4 (concluding that experienced *pro se* litigant should no longer
be afforded special leniency because continuing to afford him such leniency would be unfair to
"numerous attorneys," whose time and energy had already been consumed by plaintiff); Jessica
Case, "Pro se Litigants at the Summary Judgment Stage: Is Ignorance of the Law an Excuse?" 90
*Ky. L.J.* 701, 735-740 (Spring 2001) (discussing how extending special leniency to *pro se*
litigants in some circumstances "distorts the adversarial system and the role of trial judges")
[citing cases]; Julie M. Bradlow, "Procedural Due Process Rights of *Pro se* Civil Litigants," 55
*U. Chi. L. Rev.* 659, 672 (Spring 1988) (discussing how "extending too much procedural leniency
to a *pro se* litigant risks undermining the impartial role of the judge in the adversary system")
[citations omitted].

> He comes before this Court wearing the cloak of a *pro se* applicant, and seeks to extract from us the solicitude ordinarily afforded one appearing without counsel.  But this should not shield him from rebuke when merited.  He is an intelligent, able and sophisticated litigant, who is no stranger to this Court, having appeared frequently in his own behalf both in the District Court and the Court of Appeals.  We would expect that one possessed of his background would be conscious of the outer limits of forceful advocacy and fully aware when his acts transgress those limits.  Moreover, we are not to be manipulated by resourceful but meritless moves . . . . [which] serve only to distract us from important judicial business.[25]

Courts relying on the "experience" rationale for revoking a *pro se* litigant's special status look at a variety of factors in assessing whether or not the *pro se* litigant is experienced.  Most often, these factors include (1) the number of previous federal court actions filed, (2) the number of previous federal court appeals filed, (3) the number of previous state court actions filed, (4) the number of previous state court appeals filed, and (5) the recency or simultaneity of the actions and/or appeals.[26]

There is, of course, no formula for determining "How many is too many?"  However, *generally*, if a *pro se* litigant has filed a dozen or more actions and/or appeals before the date of the decision in question, it is quite possible that he will be deemed to be "experienced."[27]  Having

---

[25]    *Raitport v. Chem. Bank*, 74 F.R.D. 128, 133 (S.D.N.Y. 1977) [citing *Ackert v. Bryan*, No. 27240 (2d Cir. June 21, 1963) (Kaufman, J., concurring)].

[26]    *See, e.g.*, *Eggersdorf*, 8 F. App'x at 143; *Gummerson*, 201 F.3d at *2; *Flynn*, 32 F.3d at 31; *Frawley*, 2006 WL 1742738, at *3 & n.2; *Talbot*, 2005 U.S. Dist. LEXIS 39576, at *18-20 & n.10; *Riddick*, 2005 U.S. Dist. LEXIS 5394, at *7 & n.3; *Dean*, 204 F.R.D. at 257; *Santiago*, 91 F. Supp. 2d at 670; *McGann*, 1999 WL 173596, at *2, 8-10; *McClellan*, 1996 U.S. Dist. LEXIS 8164, at *3-4 & n.3; *Brown*, 1995 U.S. Dist. LEXIS 213, at *2 n.1.

[27]    *See, e.g.*, *Eggersdorf*, 8 F. App'x at 143 (denying leniency to *pro se* civil rights inmate based on fact that at one point plaintiff had **twelve** simultaneously pending lawsuits in Northern District alone); *Gummerson*, 201 F.3d at *2 (denying leniency to *pro se* civil rights inmate based on fact that plaintiff had **twelve** simultaneously pending lawsuits in Northern

said that, there are certainly some cases revoking the special status of a *pro se* litigant who has

filed *fewer* than a dozen cases.[28]  One reason for this disparity among cases revoking the special

status of experienced *pro se* litigants is that, in determining whether or not a *pro se* litigant is

"experienced," courts sometimes consider additional factors, such as the quality of the *pro se*

litigant's submissions to the Court (e.g., whether they are typed, cogent, supported by applicable

affidavits, exhibits, and/or memoranda of law, etc),[29] and whether or not the *pro se* litigant has

been victorious (or partially victorious) in any of his previous actions or appeals.[30]

---

District alone); *Talbot*, 2005 U.S. Dist. LEXIS 39576, at *18-20 & n.10 (denying leniency to *pro se* civil rights inmate based on fact that plaintiff had filed **twenty** lawsuits in Northern District alone); *Riddick*, 2005 U.S. Dist. LEXIS 5394, at *7 & n.3 (denying leniency to *pro se* civil rights inmate based on fact that plaintiff had filed **twenty** lawsuits in Northern District alone). Interestingly, this *de facto* "rule of twelve" is consistent with the California Code of Civil Procedure, which declines to extend a reduction in small-claims-court filing fees to those litigants who have filed more than 12 small-claims lawsuits in the state within the previous 12 months.  *See* Cal. Civ. Proc. § 116.230 (2006).

[28]     *See, e.g.*, *Santiago*, 91 F. Supp. 2d at 670 (denying leniency to *pro se* civil rights inmate based on fact that at one point plaintiff had **ten** lawsuits pending in Southern District); *Saunders v. Ricks*, 03-CV-0598, 2006 WL 3051792, at *2 & n.11 (N.D.N.Y. Oct. 18, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.) (denying leniency to *pro se* civil rights inmate who had previously filed **eight** federal court actions or appeals); *McClellan*, 1996 U.S. Dist. LEXIS 8164, at *3-4 & n.3 (denying leniency to *pro se* civil rights inmate based on fact that inmate had filed **seven** previous lawsuits against prison officials); *Brown*, 1995 U.S. Dist. LEXIS 213, at *2 n.1 (denying leniency to *pro se* civil rights inmate based on fact that plaintiff had **seven** lawsuits pending in Western District).

[29]     *See, e.g.*, *Saunders*, 2006 WL 3051792, at *2 (in deciding whether *pro se* plaintiff should be denied special solicitude, considering the fact that, among other things, "with regard to the current action, . . . the motion papers that [p]laintiff has submitted over the past several years have often been fairly good–being typed, being accompanied by affidavits, and containing legal memoranda, exhibits, etc.").

[30]     *See, e.g., Saudners*, 2006 WL 3051792, at *2 (in deciding whether *pro se* plaintiff should be denied special solicitude, considering the fact that plaintiff had settled two of his previous six federal court actions, receiving $25,000 in exchange for his agreement to voluntarily dismiss the actions, and the fact that some of plaintiff's motions in his many actions have been

Here, Plaintiff has filed at least ten other federal or state court actions or appeals.[31]

Moreover, Plaintiff has been an extremely prolific movant in the current action, having filed

**<u>thirty-six</u>** motions, often complete with affidavits, exhibits, memoranda of law, supplemental

papers, and reply papers.[32]  But Plaintiff's experience in this action has not been limited to filing

motions; it has also extended to filing papers (including affidavits, exhibits, memoranda of law,

supplemental papers and sur-replies) in opposition to Defendants' motions.  For example, the

result of Plaintiff's multiple submissions in opposition to Defendants' current motion for

summary judgment is a pile of declarations, supplemental declarations, memoranda of law,

supplemental memoranda of law, sur-reply memoranda of law, Rule 7.1 Responses and

---

granted); *Ab v. Sekendur*, 03-CV-4723, 2004 WL 2434220, at *5 (N.D. Ill. Oct. 28, 2004) (considering, during decision of whether *pro se* plaintiff should be denied leniency normally afforded inexperienced *pro se* litigants, fact that "[plaintiff] has successfully applied for and received . . . [a] patent, and as the record in this case indicates, he engaged in lengthy business negotiations with Anoto and various other corporations").

[31]     *See, e.g., Tracy v. New York*, 04-CV-0547 (N.D.N.Y.) (McCurn, J.) (habeas corpus proceeding); *U.S. v. Tracy*, 04-CV-0130 (S.D. Ind.) (motion by Plaintiff to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2254, the denial of which Plaintiff appealed to Seventh Circuit unsuccessfully on 10/26/04); *Tracy v. Carter*, 06-CV-1125 (S.D. Ind.) (habeas corpus proceeding, the dismissal of which Plaintiff appealed to Seventh Circuit unsuccessfully on 12/5/06); *Tracy v. U.S.*, 546 U.S. 1022 (2005) (denying Plaintiff's petition for writ of certiorari in habeas corpus proceeding); *Tracy v. Indiana*, 655 N.E.2d 1232 (Ind. Ct. App. 1995) (affirming order of Indiana Superior Court denying Plaintiff's petition for return of property after his guilty plea on charge of marijuana dealing), *reh'g denied,* No. 29A02-9409-CR-554 (Ind. Ct. App. 1995), *transfer denied* (Ind. Ct. App. 1996); *Tracy v. Indiana*, No. 29A02-0404-PC-373 (Ind. Superior Ct.), *aff'd*, 822 N.E.2d 663 (Ind. Ct. App. Jan. 20, 2005), *transfer denied*, 841 N.E.2d 177 (Ind. July 26, 2005).

[32]     (*See* Dkt. Nos. 35-37, 40, 41, 47, 49, 52, 55, 56, 61, 64, 66-68, 70, 74, 80, 83-85, 87, 90, 97-99, 101, 104, 107, 111, 114, 115, 118, 120, 123, 125, 126, 132, 133, 137, 140, 144-146, 150, 153, 158, 159.)

supplemental Rule 7.1 responses consisting of **179 pages**--*excluding exhibits*.[33]  Finally,

Plaintiff's papers in this action have been exceptionally good, almost always being typed,

coherent, organized, and, as noted earlier, accompanied by affidavits, exhibits and memoranda of

law.[34]  As a result of his exceptional papers, Plaintiff has often been victorious on his motions,

winning (or partially winning) **ten** of them.[35]

     Under the circumstances, I find that Plaintiff's special status as a *pro se* litigant should be

revoked for the remainder of this action.  Again, continuing to afford him such special status

would be unnecessary and unfairly prejudicial to Defendants.

## II.  ANALYSIS

### A.  Whether Defendants Are Protected from Liability by the Doctrine of Qualified Immunity

#### 1.  Legal Standard

"Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless

defendant's alleged conduct, when committed, violated 'clearly established statutory or

constitutional rights of which a reasonable person would have known.'" *Williams v. Smith*, 781

F.2d 319, 322 (2d Cir. 1986) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 815 [1982]).  In

determining whether a particular right was *clearly established*, courts in this circuit consider

three factors:

---

[33]    (*See* Dkt. Nos. 60, 69, 73, 139, 156.)

[34]    I note also that Plaintiff states that he is college educated.  (*See* Dkt. No. 139, Part 3, ¶ 68.)

[35]    (*See* Dkt. Nos. 50, 52, 81, 88, 100, 108, 128, 149, 152, 161.)

> (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith*, 945 F.2d 547, 550 (2d Cir. 1991) (citations omitted), *cert. denied*, 503 U.S. 962 (1992).[36]  Regarding the issue of whether *a reasonable person would have known* he was violating such a clearly established right, this "objective reasonableness"[37] test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]."  *Malley v. Briggs*, 475 U.S. 335, 341 (1986); *see also Malsh v. Correctional Officer Austin*, 901 F. Supp. 757, 764 (S.D.N.Y. 1995) (citing cases); *Ramirez v. Holmes*, 921 F. Supp. 204, 211 (S.D.N.Y. 1996).  As the Supreme Court explained,

> [T]he qualified immunity defense . . . provides ample protection to all but the plainly incompetent or those who knowingly violate the law. . . . Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized.

*Malley*, 475 U.S. at 341.  Furthermore, courts in the Second Circuit recognize that "the use of an 'objective reasonableness' standard permits qualified immunity claims to be decided as a matter of law."  *Malsh*, 901 F. Supp. at 764 (citing *Cartier v. Lussier*, 955 F.2d 841, 844 [2d Cir. 1992]

---

[36]      *See also Calhoun v. New York State Division of Parole*, 999 F.2d 647, 654 (2d Cir. 1993); *Prue v. City of Syracuse*, 26 F.3d 14, 17-18 (2d Cir. 1994).

[37]      *See Anderson v. Creighton*, 107 S.Ct. 3034, 3038 (1987) ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.'") (quoting *Harlow*, 457 U.S. at 819); *Benitez v. Wolff*, 985 F.2d 662, 666 (2d Cir. 1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

[citing Supreme Court cases]).

## 2.    Undisputed Material Facts

On April 8, 2000, at or around 8:50 p.m. in Danby, New York, Defendant Freshwater

stopped a vehicle driven by Plaintiff for a suspected traffic violation.  The weather conditions

were dark, muddy, snowy, windy, icy, and slippery.[38]  Defendant Freshwater asked Plaintiff for

his license and registration, and Plaintiff told Defendant Freshwater that he did not have his

license or registration with him.[39]  Defendant Freshwater asked whether the car was registered to

Plaintiff.[40]  While Defendant Freshwater asserts that Plaintiff responded that the car was

registered to him, Plaintiff asserts that "I do not believe I told him the car was registered to me."[41]

---

[38]    (*See*, *e.g.*, Dkt. No. 58, Part 8, ¶ 11 [Defs.' Rule 7.1 Statement]; Dkt. No. 58, Part 1, ¶ 9 [Freshwater Affid.]; Dkt. No. 60, Part 5, ¶ 11 [Plf.'s Rule 7.1 Response, not denying this particular factual assertion], *accord*, Dkt. No. 139, Part 1, ¶ 11 [Plf.'s Suppl. Rule 7.1 Response]; Dkt. No. 60, Part 2, ¶¶ 4, 11 [Plf.'s Decl., asserting, "The weather was bad, it was snowing, and the wind was blowing hard at times. . . .  When I turned around, I slipped on the ice and the snow I was standing on."].)

[39]    (Dkt. No. 58, Part 8, ¶ 14 [Defs.' Rule 7.1 Statement]; Dkt. No. 58, Part 1, ¶ 11 [Freshwater Affid.]; Dkt. No. 60, Part 5, ¶ 14 [Plf.'s Rule 7.1 Response, not denying this factual assertion, and indeed admitting that he did not have his license with him], *accord*, Dkt. No. 139, Part 1, ¶ 14 [Plf.'s Suppl. Rule 7.1 Response].)

[40]    (Dkt. No. 58, Part 8, ¶ 14 [Defs.' Rule 7.1 Statement]; Dkt. No. 58, Part 1, ¶ 11 [Freshwater Affid.]; Dkt. No. 60, Part 5, ¶ 14 [Plf.'s Rule 7.1 Response, not denying that Defendant Freshwater asked him this question], *accord*, Dkt. No. 139, Part 1, ¶ 14 [Plf.'s Suppl. Rule 7.1 Response].)

[41]    (Dkt. No. 58, Part 8, ¶ 14 [Defs.' Rule 7.1 Statement]; Dkt. No. 58, Part 1, ¶ 11 [Freshwater Affid.]; Dkt. No. 60, Part 5, ¶ 14 [Plf.'s Rule 7.1 Response, stating that he does not "believe" that he told Defendant Freshwater that the car was registered to him, without providing a record citation in support of that assertion made on belief], *accord*, Dkt. No. 139, Part 1, ¶ 14 [Plf.'s Suppl. Rule 7.1 Response].)  <u>For the sake of argument, I will treat this factual assertion by Defendant Freshwater as controverted by Plaintiff</u>, despite the fact that, by not providing a record citation in support of his assertion made on belief, Plaintiff has not adduced evidence sufficient to create a question of fact for summary judgment purposes.  I note that, although Plaintiff's Rule

After running the car's registration, Defendant Freshwater had a conversation with Plaintiff in which Plaintiff acknowledged that the car was registered to a Beverly Ruggles and stated that his name was Seth Ruggles.[42]  During a subsequent exchange with Defendant Freshwater, Plaintiff admitted that his name was not Seth Ruggles.[43]  Then, during another exchange with Defendant Freshwater, Plaintiff at least appeared to state that his name was Jeff Kerns.[44]  Defendant

7.1 Response is verified, a sworn assertion is not based on personal knowledge if, for example, it is based on mere "information and belief," as explained above in Part I.A. of this Report-Recommendation.  *See*, *supra*, note 14 of this Report-Recommendation.

[42]    (Dkt. No. 58, Part 8, ¶ 15 [Defs.' Rule 7.1 Statement]; Dkt. No. 58, Part 1, ¶¶ 12-13 [Freshwater Aff.]; Dkt. No. 60, Part 5, ¶ 15 [Plf.'s Rule 7.1 Response, generally "disput[ing]" the factual assertion in question, but supporting that dispute with only a citation to Paragraph 7 of his Declaration, which does not support the dispute but, in fact, states, "Freshwater returned to the window and asked if the car was registered to a Beverly Ruggles. I said yes.  He asked my name and I said, 'Seth A. Ruggles.'"] [emphasis added], *accord*, Dkt. No. 139, Part 1, ¶ 15 [Plf.'s Suppl. Rule 7.1 Response, citing Paragraph 7 of his Supplemental Affidavit, which also states, "Freshwater returned to the window and asked if the car was registered to a Beverly Ruggles. I said yes.  He asked my name and I said, 'Seth A. Ruggles.'"] [emphasis added].)

[43]    (Dkt. No. 58, Part 8, ¶ 16 [Defs.' Rule 7.1 Statement]; Dkt. No. 58, Part 1, ¶ 14 [Freshwater Aff.]; Dkt. No. 60, Part 5, ¶ 16 [Plf.'s Rule 7.1 Response, generally "disput[ing]" the factual assertion in question, but supporting that dispute with only a citation to Paragraph 8 of his Declaration, which does not support the dispute but, in fact, states, "Freshwater said something that was indistinguishable due to the wind in the background (the weather was bad).  Then I heard something about a birth date.  Then he said something that was indistinguishable again.  I then said I was not 'Seth Ruggles.'"] [emphasis added], *accord*, Dkt. No. 139, Part 1, ¶ 16 [Plf.'s Suppl. Rule 7.1 Response, citing Paragraph 8 of his Supplemental Affidavit, which also states, "Freshwater said something that was indistinguishable due to the wind in the background (the weather was bad).  Then I heard something about a birth date.  Then he said something that was indistinguishable again.  I then said I was not 'Seth Ruggles.'"] [emphasis added].)

[44]    (Dkt. No. 58, Part 8, ¶ 17 [Defs.' Rule 7.1 Statement]; Dkt. No. 58, Part 1, ¶ 5 [Freshwater Aff.]; Dkt. No. 60, Part 5, ¶ 17 [Plf.'s Rule 7.1 Response, generally "disput[ing]" the factual assertion in question, but supporting that dispute with only a citation to Paragraph 9 of his Declaration, which does not support the dispute but, in fact, states, "Freshwater then glared at me and said something else I could not fully understand.  I heard something about a name and I

Freshwater asked Plaintiff to step out of the vehicle, and Plaintiff did so.[45]  Defendant Freshwater

then asked Plaintiff to turn around and place his hands on top of his head.[46]

    At this point in the incident, Plaintiff's account of events starts to more significantly

differ from Defendant Freshwater's account of events.  Plaintiff asserts that he placed his hands

on his head but, when he started to turn around, he slipped on the ice and had to grab the car in

front of him to keep himself from falling.[47]  Plaintiff asserts that, immediately thereafter,

Defendant Freshwater struck him on the back of the head with a metal flashlight.[48]  Defendant

---

said 'Jeff A. Kerns.'  He asked for a date of birth while staring at me.  Before I could clarify or answer, he ordered me out of the car.  I was not stammering, fidgeting, or refusing to answer as he claims."] [emphasis added], *accord*, Dkt. No. 139, Part 1, ¶ 17 [Plf.'s Suppl. Rule 7.1 Response, citing Paragraph 9 of his Supplemental Affidavit, which also states, "Freshwater then glared at me and said something else I could not fully understand.  <u>I heard something about a name and I</u> said 'Jeff A. Kerns.'  He asked for a date of birth while staring at me.  Before I could clarify or answer, he ordered me out of the car.  I was not stammering, fidgeting, or refusing to answer his claims."] [emphasis added].)

[45]    (Dkt. No. 58, Part 8, ¶ 18 [Defs.' Rule 7.1 Statement]; Dkt. No. 58, Part 1, ¶ 16 [Freshwater Affid.]; Dkt. No. 60, Part 5, ¶ 18 [Plf.'s Rule 7.1 Response, not specifically controverting the asserted facts in any material way and/or not supporting any such denial with a record citation that actually substantiates the denial], *accord*, Dkt. No. 139, Part 1, ¶ 18 [Plf.'s Suppl. Rule 7.1 Response]; Dkt. No. 60, Part 2, ¶¶ 9-10 [Plf.'s Decl., admitting the facts stated above], *accord*, Dkt. No. 139, Part 3, ¶¶ 9-10 [Plf.'s Suppl. Affid.].)

[46]    (Dkt. No. 58, Part 8, ¶ 18 [Defs.' Rule 7.1 Statement]; Dkt. No. 58, Part 1, ¶ 16 [Freshwater Affid.]; Dkt. No. 60, Part 5, ¶ 18 [Plf.'s Rule 7.1 Response, not specifically controverting the asserted facts in any material way and/or not supporting any such denial with a record citation that actually substantiates the denial], *accord*, Dkt. No. 139, Part 1, ¶ 18 [Plf.'s Suppl. Rule 7.1 Response]; Dkt. No. 60, Part 2, ¶¶ 10-11 [Plf.'s Decl., admitting the facts stated above], *accord*, Dkt. No. 139, Part 3, ¶¶ 10-11 [Plf.'s Suppl. Affid.].)

[47]    (Dkt. No. 60, Part 2, ¶¶ 10-11 [Plf.'s Decl.], *accord*, Dkt. No. 139, Part 3, ¶¶ 10-11 [Plf.'s Suppl. Affid.].)

[48]    (Dkt. No. 60, Part 2, ¶ 12 [Plf.'s Decl.], *accord*, Dkt. No. 139, Part 3, ¶ 12 [Plf.'s Suppl. Affid.].)

Freshwater, on the other hand, asserts that, after he directed Plaintiff to turn around and place his hands on top of his head, Plaintiff began to run toward the road, colliding with Defendant Freshwater, and forcing Defendant Freshwater to use his flashlight to subdue Plaintiff.[49]

In any event, I find that this difference in the parties' accounts of *why* Plaintiff started to suddenly move (following Defendant Freshwater's order to turn around and place his hands on top of his head) is not material to Defendants' motion for summary judgment. What is material is that both parties agree that, following Defendant Freshwater's order to turn around and place his hands on top of his head, there was a sudden movement by Plaintiff and then the use of a metal flashlight by Defendant Freshwater.

Although both parties also dispute various details of what transpired following Defendant Freshwater's use of his flashlight, they do agree to a core sequence of material events. Specifically, following Defendant Freshwater's use of his flashlight, Plaintiff started to run toward Defendant Freshwater, then Plaintiff started to run toward Defendant Freshwater's police vehicle.[50] A struggle ensued between Plaintiff and Defendant Freshwater in which Plaintiff continued to try to run toward Defendant Freshwater's vehicle (and then toward a business identified by Plaintiff as "Dobson's Auto") and in which Defendant Freshwater tried to stop and subdue him.[51] During this struggle, Defendant Freshwater and Plaintiff fell to the ground, where

---

[49]    (Dkt. No. 58, Part 1, ¶ 17 [Freshwater Affid.].)

[50]    (Dkt. No. 60, Part 2, ¶ 14 [Plf.'s Decl.], *accord*, Dkt. No. 139, Part 3, ¶ 14 [Plf.'s Suppl. Affid.]; Dkt. No. 58, Part 1, ¶ 18 [Freshwater Affid.]; Dkt. No. 60, Part 4, Ex. C at 1 [Def. Freshwater's Sworn Statement, dated 4/9/00].)

[51]    (Dkt. No. 60, Part 2, ¶¶ 18, 19, 21, 22 [Plf.'s Decl.], *accord*, Dkt. No. 139, Part 3, ¶¶ 18, 19, 21, 22 [Plf.'s Suppl. Affid.]; Dkt. No. 58, Part 1, ¶ 18 [Freshwater Affid.]; Dkt. No. 60, Part 4, Ex. C at 1, 2 [Def. Freshwater's Sworn Statement, dated 4/9/00].)

Plaintiff experienced pain, presumably on his right side (for the sake of argument, I will assume

that, as Plaintiff has asserted, Defendant Freshwater fell upon Plaintiff, who fell to the ground).[52]

While Plaintiff was on the ground, Defendant Freshwater pepper-sprayed Plaintiff and then

handcuffed Plaintiff (or handcuffed him and *then* pepper-sprayed him).[53]  After Plaintiff was

pepper-sprayed and handcuffed, Defendant Freshwater tried to call for back up on his portable

police radio, but the portable radio was not working properly (apparently because of the

inclement weather or perhaps because of the scuffle).[54]  Defendant Freshwater then instructed

Plaintiff to stand up so that they could get back to Defendant Freshwater's vehicle, and Plaintiff

responded that he could not get up because his knee was hurt.[55]  Defendant Freshwater

responded, in part, "That's too bad" or "I don't care," and "I'll drag you there by your hair if you

---

[52]     (Dkt. No. 60, Part 2, ¶ 24 [Plf.'s Decl.], *accord*, Dkt. No. 139, Part 3, ¶ 24 [Plf.'s Suppl. Affid.]; Dkt. No. 58, Part 1, ¶ 18 [Freshwater Affid.]; Dkt. No. 60, Part 4, Ex. C at 2 [Def. Freshwater's Sworn Statement, dated 4/9/00].)

[53]     (Dkt. No. 60, Part 2, ¶¶ 26-27 [Plf.'s Decl.], *accord*, Dkt. No. 139, Part 3, ¶¶ 26-27 [Plf.'s Suppl. Affid.]; Dkt. No. 58, Part 1, ¶ 19 [Freshwater Affid.]; Dkt. No. 60, Part 4, Ex. C at 2 [Def. Freshwater's Sworn Statement, dated 4/9/00].)

[54]     (Dkt. No. 58, Part 1, ¶ 18 [Freshwater Affid.]; Dkt. No. 60, Part 4, Ex. C at 2 [Def. Freshwater's Sworn Statement, dated 4/9/00]; Dkt. No. 60, Part 4, Ex. D at 133 [Testimony of Def. Freshwater at Plf.'s Criminal Trial]; Dkt. No. 60, Part 4, Ex. E at 39 [Deposition Transcript, in which Plaintiff testified that, after Plaintiff was pepper-sprayed and handcuffed, and while Plaintiff's face was toward the ground, behind him Defendant Freshwater "was fiddling around with something.  I don't know exactly what he was doing . . . my face was down at this point.  He was sitting on top of me."].)

[55]     (Dkt. No. 60, Part 2, ¶¶ 30-31 [Plf.'s Decl.], *accord*, Dkt. No. 139, Part 3, ¶¶ 30-31 [Plf.'s Suppl. Affid.]; Dkt. No. 58, Part 1, ¶¶ 20-21 [Freshwater Affid.]; Dkt. No. 60, Part 4, Ex. C at 2 [Def. Freshwater's Sworn Statement, dated 4/9/00].)

don't get up."[56]  As Defendant Freshwater brought Plaintiff to his feet, both men heard a "pop"

coming from the vicinity of Plaintiff's right hip, and Plaintiff fell to his side.[57]  Defendant

Freshwater helped Plaintiff toward Defendant Freshwater's vehicle, which was about 20 feet

away.[58]  Once both men were inside the vehicle (Plaintiff sitting with his legs hanging out of an

open back door), Defendant Freshwater radioed for back up and emergency medical personnel.[59]

At some point thereafter an ambulance and other deputy sheriffs arrived on the scene.[60]  Plaintiff

was taken to Cayuga Medical Center.[61]  Plaintiff was diagnosed as having a dislocated right hip

---

[56]     (Dkt. No. 60, Part 4, Ex. D at 27, 70 [Testimony of Def. Freshwater at Plf.'s
Criminal Trial]; Dkt. No. 60, Part 2, ¶ 32 [Plf.'s Decl.], *accord*, Dkt. No. 139, Part 3, ¶ 32 [Plf.'s
Suppl. Affid.]; Dkt. No. 60, Part 4, Ex. E at 37 [Plf.'s Deposition Transcript].)

[57]     (Dkt. No. 60, Part 2, ¶¶ 31-33 [Plf.'s Decl.], *accord*, Dkt. No. 139, Part 3, ¶¶ 31-
33 [Plf.'s Suppl. Affid.]; Dkt. No. 58, Part 1, ¶ 21 [Freshwater Affid.]; Dkt. No. 60, Part 4, Ex. C
at 2 [Def. Freshwater's Sworn Statement, dated 4/9/00]; Dkt. No. 60, Part 4, Ex. D at 27
[Testimony of Def. Freshwater at Plf.'s Criminal Trial].)

[58]     (Dkt. No. 60, Part 2, ¶ 36 [Plf.'s Decl., asserted that Defendant Freshwater was
"holding me up so I couldn't fall down"], *accord*, Dkt. No. 139, Part 3, ¶ 36 [Plf.'s Suppl.
Affid.]; Dkt. No. 58, Part 1, ¶ 21 [Freshwater Affid.]; Dkt. No. 60, Part 4, Ex. C at 2 [Def.
Freshwater's Sworn Statement, dated 4/9/00]; Dkt. No. 60, Part 4, Ex. D at 27 [Testimony of
Def. Freshwater at Plf.'s Criminal Trial].)

[59]     (Dkt. No. 60, Part 2, ¶¶ 37-39 [Plf.'s Decl., asserted that, after Plaintiff told
Defendant Freshwater that he needed medical attention, "[a]n ambulance arrived with other
sheriff's department employees"], *accord*, Dkt. No. 139, Part 3, ¶¶ 37-39 [Plf.'s Suppl. Affid.];
Dkt. No. 60, Part 4, Ex. E at 39 [Deposition Transcript, in which Plaintiff testified, "I'm sure that
when [Defendant Freshwater] called for backup, that that was what caused [the ambulance and
other sheriff's deputies] to come."]; Dkt. No. 58, Part 1, ¶ 21 [Freshwater Affid.]; Dkt. No. 60,
Part 4, Ex. C at 2 [Def. Freshwater's Sworn Statement, dated 4/9/00].)

[60]     (Dkt. No. 60, Part 2, ¶ 39 [Plf.'s Decl.], *accord*, Dkt. No. 139, Part 3, ¶ 39 [Plf.'s
Suppl. Affid.]; Dkt. No. 58, Part 1, ¶ 22 [Freshwater Affid.]; Dkt. No. 60, Part 4, Ex. C at 2 [Def.
Freshwater's Sworn Statement, dated 4/9/00].)

[61]     (Dkt. No. 60, Part 2, ¶ 39 [Plf.'s Decl.], *accord*, Dkt. No. 139, Part 3, ¶ 39 [Plf.'s
Suppl. Affid.]; Dkt. No. 58, Part 1, ¶ 23 [Freshwater Affid.].)

with a "posterior acetabular wall fracture."[62]  As a result of the incident, Plaintiff was convicted

of several crimes, including criminal impersonation in the second degree and resisting arrest.[63]

These convictions have been upheld by state courts on appeal.[64]

### 3.    Discussion

An analysis of an excessive force claim[65] requires, in essence, a balancing of the amount

of force used to effect the seizure in question against the opposing governmental interests at

stake, in particular, (1) the severity of the crime at issue, (2) whether the suspect posed an

immediate threat to the safety of the officers or others, and (3) whether the suspect was actively

resisting arrest or attempting to evade arrest by flight.  *See Graham v. Connor*, 490 U.S. 386, 396

(1989); *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985).  As a result, "[n]ot every push or shove,

even if it may later seem unnecessary in the peace of a judge's chambers, . . . violates the Fourth

Amendment."  *Graham*, 490 U.S. at 397 [internal quotation marks and citation omitted].  Rather,

"[t]he calculus of reasonableness must embody allowance for the fact that police officers are

often forced to make split-second judgments--in circumstances that are tense, uncertain, and

---

[62]      (Dkt. No. 60, Part 3, Ex. A [Plf.'s Univ. Health Ctr. medical records].)

[63]      (Dkt. No. 58, Part 8, ¶ 25 [Defs.' Rule 7.1 Statement]; Dkt. No. 58, Part 1, ¶ 28 [Freshwater Affid.]; Dkt. No. 58, Part 5, Ex. H [Certificate of Plf.'s Conviction]; Dkt. No. 60, Part 5, ¶ 25 [Plf.'s Rule 7.1 Response, not providing citation to any record evidence that actually controverts this factual assertion], *accord*, Dkt. No. 139, Part 1, ¶ 25 [Plf.'s Suppl. Rule 7.1 Response].)

[64]      (Dkt. No. 58, Part 8, ¶ 26 [Defs.' Rule 7.1 Statement]; Dkt. No. 60, Part 5, ¶ 25, 26 [Plf.'s Rule 7.1 Response, not denying the above-stated factual assertion].)

[65]      I note that Plaintiff's claim of battery is duplicative of his claim of excessive force.  *See Raymond*, 136 F. Supp.2d at 81 ("[Plaintiff's] cause of action [for assault] must be dismissed, as it is duplicative of [Plaintiff's] third cause of action for excessive force.") [citations omitted].

rapidly evolving--about the amount of force that is necessary in a particular situation." *Id*.

Here, the crime at issue was criminal impersonation in the second degree, a class A misdemeanor punishable by up to one year in prison.[66]  (I note that, in addition, record evidence exists indicating that Defendant Freshwater suspected, from Plaintiff's deceptiveness and demeanor during the traffic stop, that Plaintiff might be wanted in connection with other crimes. *See*, *e.g.*, Dkt. No. 58, Part 1, ¶¶ 14-16 [Freshwater Decl.].)  Moreover, Plaintiff posed an immediate threat to the safety of Defendant Freshwater and/or others in that he made a sudden move in the dark of night after being instructed to turn around and place his hands on his head, and then he attempted to run--first toward Defendant Freshwater, then toward Defendant Freshwater's police vehicle (which could have been used by Plaintiff as a deadly weapon), and finally toward a business called "Dobson's Auto."[67]  (I note that, during the struggle that ensued

---

[66]     *See* N.Y. Penal Law § 190.25(1); N.Y. Penal Law §§ 70.15(1).

[67]     *See*, *e.g.*, *Webster v. Beary*, No. 06-12194, 2007 U.S. App. LEXIS 8142, at *4-7, 13-14, 19 (11th Cir. Apr. 4, 2007) (affirming grant of summary judgment to sheriff's deputies on ground of qualified immunity in excessive-force action where, at time of shooting, deputies reasonably believed that fleeing suspect was attempting to use stolen vehicle as deadly weapon against deputies on foot); *Waterman v. Batton*, 393 F.3d 471, 479-480 (4th Cir. 2004) (reversing denial of summary judgment to police officers on ground of qualified immunity in excessive force action, where at time of incident, plaintiff was fleeing in vehicle, which he could have steered into officers on foot); *Scott v. Edinburg*, 346 F.3d 752, 754-759 (7th Cir. 2003) (affirming grant of summary judgment to officer in excessive force action, where suspect was fleeing in officer's car, which could have accidentally hit bystander); *Pace v. Capobianco*, 283 F.3d 1275, 1277-1278, 1282 (11th Cir. 2002) (reversing denial of summary judgment to police officers on ground of qualified immunity in excessive force action, where pepper-sprayed subject fled in vehicle, nearly hit other motorists, and accelerated toward patrol car blocking his escape); *Smith v. Freland*, 954 F.2d 343, 344, 347 (6th Cir.) (affirming grant of summary judgment to police officers in excessive force action, where suspect fled in vehicle in residential area and smashed an unoccupied police vehicle that blocked his path), *cert. denied*, 504 U.S. 915 (1992); *Williams v. City of Grosse Pointe Park*, 03-CV-73596, 2005 U.S. Dist. LEXIS 35528, at *5-6 (E.D. Mich. Sept. 6, 2005) (granting summary judgment to police officers on ground of qualified immunity in excessive force action, where suspect, unintimidated by police presence, did not hesitate to

between Plaintiff and Defendant Freshwater, Defendant Freshwater sustained a bruised shoulder, requiring medical care.  *See* Dkt. No. 58, Part 1, ¶ 22 [Freshwater Decl.]; Dkt. No. 139, Part 4, Ex. D at 17-18 [Testimony of Def. Freshwater During Plf.'s Criminal Trial].)  Furthermore, Plaintiff was either actively resisting arrest or attempting to evade arrest by flight.  Through these actions, Plaintiff placed Defendant Freshwater in what one court has appropriately called "a vulnerable situation."  *See McLuarin v. New Rochelle Police Officers*, 373 F. Supp.2d 385, 392 (S.D.N.Y. 2005) (granting in part officers' motion for judgment on pleadings regarding arrestee's excessive force claim based on doctrine of qualified immunity).  Although Plaintiff asserts that, near the end of the struggle, he said to Defendant Freshwater, "I am not resisting," even if I were to assume the truth of this assertion, I find that "no reasonable officer could assume that plaintiff was not still a threat to [him by] further resist[ing] arrest and/or threat[ening] the safety of the officer[]."  *McLaurin*, 373 F. Supp.2d at 393.

In reaching this conclusion that Defendant Freshwater's use of force was objectively reasonable under the circumstances, I emphasize that it is undisputed that Defendant Freshwater's use of his flashlight as a weapon was immediately preceded by (1) Plaintiff's acknowledgment that he did not have his driver's license on his person at the time, (2) at least one misrepresentation by Plaintiff concerning his identity, and (3) a sudden movement by

---

deliberately use a stolen vehicle as a weapon against officers); *Reid v. Ford*, 02-CV-0244, 2005 U.S. Dist. LEXIS 11183, at *3, 11-13 (M.D.N.C. Apr. 22, 2005) (granting summary judgment to officers on ground of qualified immunity in excessive force action, where plaintiff attempted to use vehicle as weapon against officers, and then proceeded toward main road, posing danger to others); *Hinton v. Lee*, 91-CV-1874, 1995 U.S. Dist. LEXIS 6658, at *3-4, 14-15 (E.D. La. May 9, 1995) (granting summary judgment to sheriff's deputies on ground of qualified immunity in excessive force action, where suspect, while fleeing in vehicle near deputies on foot on lawn, placed the deputies at risk of serious harm).

Plaintiff on a dark and stormy night.  It is also undisputed that the struggle that ensued between Plaintiff and Defendant Freshwater was caused, in large part, by Plaintiff's repeated attempts to flee the scene.[68]  Finally, it is also undisputed that, after the parties' struggle and before Defendant Freshwater made Plaintiff stand up, Plaintiff complained of a possible injury to his *knee* (not his hip), and that, following hearing a "pop" coming from Plaintiff's hip, Defendant Freshwater *assisted* Plaintiff to the police vehicle, where Defendant Freshwater was able to call for back up and medical assistance, and where Plaintiff was sheltered from the effects of the snow storm.

In short, a series of bad choices by Plaintiff (coupled with the misfortunate effects of bad weather) resulted in a series of responses by Defendant Freshwater that were objectively reasonable and, frankly, rather predictable by any competent law enforcement officer under the circumstances.  Even if Defendant Freshwater became angry and yelled at Plaintiff after the men's struggle in the snow, ice and mud (as Plaintiff has asserted), such a response would not have been unreasonable.

In opposing Defendants' motion, Plaintiff spends much effort attempting to create a factual issue out of whether or not Defendant Freshwater was, during the time in question, attempting to effect a lawful arrest of Plaintiff.[69]  He tries to create this factual issue because he

---

[68]     "While the mere fact that plaintiff resisted arrest is not dispositive of [the issue of whether an officer's use of force was excessive], it *is* relevant to the inquiry.  *Raymond v. Bunch*, 136 F. Supp. 2d 71, 80 (N.D.N.Y. 2001) (Hurd, J.) [emphasis in original; citation omitted].

[69]     For example, Plaintiff argues that his Certificate of Conviction and arrest reports indicate that he was arrested on "4/14/00," after he was released from the hospital (i.e., not on April 8, 2000), for the four crimes of which he was convicted.  (Dkt. No. 58, Part 5, Ex. H [Certificate of Plf.'s Conviction]; Dkt. No. 139, Part 5, Ex. H [Plf.'s Arrest Report and Supplemental Report].)  Of course, those documents do not in any way indicate that Defendant

argues that, if Plaintiff "was <u>not</u> being arrested[,] [then] no use of force could be deemed reasonable . . . ."  (Dkt. No. 139, Part 2 at 4 [Plf.'s Supp. Mem. of Law].)  In making this argument, Plaintiff acknowledges that, on December 1, 2000, he was convicted of, *inter alia*, resisting arrest during the time in question.  However, Plaintiff argues that the Court should disregard this conviction for resisting arrest because he has filed a habeas corpus petition challenging that conviction.  (*Id.* at note 2.)

I am not inclined to disregard Plaintiff's conviction for resisting arrest in light of (1) the doctrine of collateral estoppel, and (2) the nature of Plaintiff's arguments in his habeas corpus petition.[70]  Even if I were inclined to disregard that conviction, I could not disregard the fact that Defendant Freshwater had, when Plaintiff stepped out of the vehicle he was driving, probable cause to try to effect a lawful arrest of Plaintiff for the crime of criminal impersonation in the second degree.  *See* N.Y. Penal Law § 190.25(1) (providing, in pertinent part, "[a] person is guilty of criminal impersonation in the second degree when he . . . [i]mpersonates another and does an act in such assumed character with intent to obtain a benefit or to injure or defraud

––––––––––––––––––––––––––––

Freshwater did not have grounds to arrest Plaintiff on April 8, 2000 for the crime of criminal impersonation in the second degree.

[70]     *See Tracy v. N.Y.S. Atty. Gen.*, 04-CV-0547, Petition, ¶ 12(A)-(F) (N.D.N.Y. filed May 13, 2004) (McCurn, J.) (challenging his convictions on the grounds of [1] ineffective assistance of appellate counsel, [2] ineffective assistance of trial counsel, [3] various violations of *Brady v. Maryland*, 373 U.S. 83 (1963), [4] various violations of *Miranda v. Arizona*, 384 U.S. 436 (1966), [5] various due process violations under the Fifth and Fourteenth Amendments, and [6] prosecutorial misconduct).  In particular, I can find no argument specifically addressing why the Court should reverse his conviction for resisting arrest, other than his argument that his trial counsel "failed to object to the material misstatements of fact[] concerning such things as the Petitioner's true date and location of his arrest, and by whom . . . ."  *Id.* at ¶ 12(B).

another . . . .").  Thus, Plaintiff's argument fails.[71]

As a result, I recommend that the Court dismiss Plaintiff's claims against Defendant Freshwater based on the doctrine of qualified immunity.  Having reached the issue of whether Plaintiff's claims against Defendant Freshwater should be dismissed based on the doctrine of qualified immunity, it is now appropriate to address the issue of whether Plaintiff's claims against Defendants Meskill and Tompkins County should also be dismissed based on the doctrine of qualified immunity, as Defendants argue they should.[72]  The short answer is that the qualified immunity defense is *not* available to municipal defendants.[73]  However, simple logic dictates that, where the liability of a municipal defendant is premised on the wrongdoing of an individual defendant, and it has been determined that there has been no such wrongdoing by the individual defendant (because of the doctrine of qualified immunity or some other reason), then the liability of the municipal defendant is precluded.[74]  Here, because the liability of Defendants

---

[71]    *See Raymond*, 136 F. Supp.2d at 81 ("In fact, plaintiff's entire argument in opposition to dismissal of this claim [of excessive force] is predicated upon the assertion that because the defendants lacked probable cause to arrest him, the use of any force was excessive.  Because, as noted above, [Officer] Bunch and [Sergeant] Smith did have probable cause to arrest plaintiff, this argument must be rejected.  Accordingly, [Plaintiff's] third cause of action for excessive force is dismissed.").

[72]    (*See*, *e.g.*, Dkt. No. 58, Part 9, at 8 [Defs.' Mem. of Law].)

[73]    *See Shekan v. Village of Mamaroneck*, 465 F.3d 96, 109 (2d Cir. 2006) ("Municipalities are not entitled to qualified immunity for their actions, even where the individual officers who acted on the municipality's behalf would be.") [citing *Owen v. City of Independence, Missouri*, 445 U.S. 622, 657 [1980]).

[74]    *See Clubside, Inc. v. Valentin*, 468 F.3d 144, 161 (2d Cir. 2006) ("Simply put, if a claim fails as to the individual defendants because there was no violation of the plaintiff's constitutional rights [under the qualified immunity doctrine], then it necessarily fails as to the municipality as well.  Here, we have concluded that the individual board members are entitled to qualified immunity on [the plaintiff's] substantive due process claim because they did not violate

Meskill and Tompkins County is premised on the wrongdoing of Defendant Freshwater, and

because there has been no wrongdoing by Defendant Freshwater, I find that the liability of

Defendants Meskill and Tompkins County is precluded.  As a result, I recommend that the Court

also dismiss Plaintiff's claims against Defendants Meskill and Tompkins County.  Even if I did

not reach this latter conclusion based on simple logic, I would reach that conclusion on an

alternative ground, i.e., based on an analysis of the principles of limited municipal liability

announced in *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and its progeny, set

forth below.

      **B.**     **Whether Defendants Meskill and Tompkins County Are Protected from
Liability by the Rule Announced in *Monell v. Department of Social Services*,
436 U.S. 658 (1978)**

          **1.**     **Legal Standard**

"A municipality may not be held liable in a § 1983 action for the conduct of a lower-

echelon employee solely on the basis of *respondeat superior*."[75]  "Rather, to establish municipal

liability under § 1983 for unconstitutional acts by a municipality's employees, a plaintiff must

show that the violation of [his or] her constitutional rights resulted from a municipal custom or

policy."[76]

_____

[the plaintiff's] substantive due process rights under the Fourteenth Amendment.  It is therefore
not possible for [the municipal defendant] to be held liable on this claim.").

     [75]     *Powell v. Bucci*, 04-CV-1192, 2005 WL 3244193, at *5 (N.D.N.Y. Nov. 30,
2005) (McAvoy, J.); *see also Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 691 (1978) ("[A]
local government may not be sued under § 1983 for an injury inflicted solely by its employees or
agents."); *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983) ("[A] [municipality] may not
be held for the actions of its employees or agents under a theory of *respondeat superior*.").

     [76]     *Powell*, 2005 WL 3244193, at *5; *Monell*, 436 U.S. at 690-691 ("[L]ocal
governments . . . may be sued for constitutional deprivations visited pursuant to governmental

"Thus, to hold a [municipality] liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to . . . prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right."[77]

With regard to the first element (the existence of a policy or custom), a "[p]laintiff may establish the 'policy, custom or practice' requirement by demonstrating either: (1) a formal policy officially endorsed by the municipality . . . ; (2) actions taken by government officials responsible for establishing municipal policies related to the particular deprivation in question . . . ; (3) a practice so consistent and widespread that it constitutes a 'custom or usage' sufficient to impute constructive knowledge of the practice to policymaking officials . . . ; or (4) a failure by policymakers to train or supervise subordinates to such an extent that it amounts to 'deliberate indifference' to the rights of those who come in contact with the municipal employees. . . ."[78]

---

'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels."); *Batista*, 702 F.2d at 397 ("[M]unicipalities may be sued directly under § 1983 for constitutional deprivations inflicted upon private individuals pursuant to a governmental custom, policy, ordinance, regulation, or decision."); *Smith v. City of New York*, 290 F. Supp.2d 317, 321 (S.D.N.Y. 2003) ("In order to establish the liability of [municipal] defendants in an action under § 1983 for unconstitutional acts by [its] employees, a plaintiff must show that the violation of [his or] her constitutional rights resulted from a municipal custom or policy.").

[77]    *Batista*, 702 F.2d at 397, *accord*, *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995), *McKeon v. Daley*, 101 F. Supp.2d 79, 92 (N.D.N.Y. 2000) (Hurd, J.), *Merriman v. Town of Colonie, NY*, 934 F. Supp. 501, 508 (N.D.N.Y. 1996) (Homer, M.J.); *Douglas v. County of Tompkins*, 90-CV-0841, 1995 WL 105993, at *12 (N.D.N.Y. March 2, 1995) (McCurn, J.), *Keyes v. County of Albany*, 594 F. Supp. 1147, 1156 (N.D.N.Y. 1984) (Miner, J.).

[78]    *Dorsett-Felicelli, Inc.*, 371 F. Supp.2d 183, 194 (N.D.N.Y. 2005) (Kahn, J.) (citing three Supreme Court cases for these four ways), *accord*, *Dunbar v. County of Saratoga*, 358 F. Supp.2d 115, 133-134 (N.D.N.Y. 2005) (Munson, J.); *see also Clayton v. City of Kingston*, 44 F. Supp.2d 177, 183 (N.D.N.Y. 1999) (McAvoy, J.) (transposing order of second and third ways, and citing five more Supreme Court cases).

28

With regard to the second element (causation), a plaintiff must show "a direct causal link" or "an affirmative link" between the municipal policy or custom and the alleged constitutional deprivation (i.e., that the policy or custom was the "moving force" behind the deprivation).[79]

## 2.    Undisputed Material Facts

In January of 2000, Defendant Meskill hired Defendant Freshwater as a Tompkins County Deputy Sheriff after a background investigation of Defendant Freshwater's qualifications (including interviews with Defendant Freshwater and Defendant Freshwater's then-current employer, Cortland City Police Department), during which Defendant Meskill did not learn of any problems involving Defendant Freshwater, and from which Defendant Meskill concluded

---

[79]    *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989) ("[O]ur first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation."); *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823, n.8 (1985) ("The fact that municipal 'policy' might lead to 'police misconduct' is hardly sufficient to satisfy *Monell*'s requirement that the particular policy be the 'moving force' behind a constitutional violation.  There must at least be an affirmative link between [for example] the training inadequacies alleged, and the particular constitutional violation at issue."); *Monell*, 436 U.S. at 694 ("[I]t is when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983.  Since this case unquestionably involves official policy as the moving force of the constitutional violation [at issue] . . . we must reverse the judgment below."); *Vippolis v. Village of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985) ("A plaintiff who seeks to hold a municipality liable in damages under section 1983 must prove that . . . an official policy or custom [was] the cause of the deprivation of constitutional rights. . . . [T]he plaintiff must establish a causal connection–an affirmative link–between the policy and the deprivation of his constitutional rights.") [internal quotation marks and citation omitted]; *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983) ("Absent a showing of a causal link between an official policy or custom and the plaintiff's injury, *Monell* prohibits a finding of liability against the City."); *Powell*, 2005 WL 3244193, at *5 ("Ultimately, the plaintiff must demonstrate a direct causal link between a municipal policy or custom, and the alleged constitutional deprivation.") [internal quotation marks and citation omitted].

that Defendant Freshwater was qualified for employment as a deputy sheriff.[80]

For example, by January of 2000, Defendant Freshwater had (1) served for more than six years (from 1994 to 1999) as a Cortland City Police Officer, (2) received a Certificate of Commendation regarding DWI arrests in February of 1998, and (3) completed a Police Field Training Officer Course in February of 1999, and a "General Topics" Police Instructor Course in September of 1995, and (4) graduated from Basic Police Academy (at Onondaga Community College) in 1994, and Nyack College in 1990, where he received a bachelors of arts degree in social science.[81]

After Defendant Meskill hired Defendant Freshwater (in January of 2000), but before the occurrence of the incident in question (on April 8, 2000), an incident occurred (on March 5,

---

[80]    (Dkt. No. 58, Part 8, ¶ 5 [Defs.' Rule 7.1 Statement]; Dkt. No. 58, Part 6, ¶¶ 3-5 [Meskill Affid.]; Dkt. No. 60, Part 5, ¶ 5 [Plf.'s Rule 7.1 Response, "questioning" whether Defendant Meskill performed a "background search" of Defendant Freshwater, but not citing any record evidence that actually controverts Defendants' factual assertion that Defendant Meskill performed such a search, citing only (1) Exhibit B, which contains a partial pleading in a civil action filed *after* Defendant Meskill hired Defendant Freshwater in January of 2000, and a partial pleading in a civil action of which Defendant Meskill is not shown to have had any notice in January of 2000, (2) Exhibit E, which contains a portion of Plaintiff's deposition testimony that is not probative of the issues at hand, and (3) Paragraphs 45 and 46 of Plaintiff's Declaration, which are also not probative of the issues at hand], *accord*, Dkt. No. 139, Part 3, ¶ 5 [Plf.'s Suppl. Rule 7.1 Response, citing Paragraphs 41 and 42 of Plaintiff's Supplemental Affidavit, which Paragraphs contain (1) in Paragraph 41, criticism that a portion of Defendant Meskill's affidavit testimony is false, which is insufficient to create an issue of fact on a summary judgment motion, and (2) in Paragraph 42, criticism of a paragraph of Defendant Meskill's affidavit other than one of the three paragraphs relevant to the issues at hand]; *see also* (Dkt. No. 139, Part 5 [Ex. O to Plf.'s Suppl. Affid., indicating that Undersheriff Randolph Haus did not learn of any problems regarding Defendant Freshwater until *after* Defendant Meskill had hired Defendant Freshwater].)

[81]    (Dkt. No. 58, Part 1, ¶¶ 3-7 & Exs. A-C [Freshwater Affid.]; *see generally* Dkt. Dkt. No. 60, Part 5, ¶¶ 3-5 [Plf.'s Rule 7.1 Response, citing no record evidence controverting the above-stated facts], *accord*, Dkt. No. 139, Part 3, ¶ 5 [Plf.'s Suppl. Rule 7.1 Response].)

2000) that eventually gave rise to an excessive-force claim by a third-party (JoAnn J. Myer-Foland) against Defendant Freshwater.[82]  In pertinent part, that claim alleged that Defendant Freshwater used excessive force while responding to a 911 call for medical assistance for an "incapacitated" woman while she was lying in a friend's backyard.[83]  However, Defendants Meskill and Tompkins County were not served with a Notice of Claim regarding that excessive-force claim against Defendant Freshwater until at least twelve days *after* the incident in question (i.e., on April 20, 2000).[84]  Moreover, Tompkins County Undersheriff Joseph Vitale "investigated the allegations of that complaint at the time they were made and found them to be without merit."[85]  Furthermore, since Defendant Freshwater became a Deputy Sheriff of Tompkins County (in January of 2000), that incident (on March 5, 2000) was the sole incident

---

[82]    (Dkt. No. 139, Part 3 [Ex. B to Plf.'s Suppl. Affid., attaching Notice of Claim and Complaint in action of *Myer-Foland v. Tompkins County*, Index No. 2001-0404 (Supreme Court, Tompkins County)].)

[83]    (*Id*.)

[84]    (*Id.* [attaching Notice of Claim by Ms. Myer-Foland against Defendants County, Meskill and Freshwater dated *4/20/00*] [emphasis added]; *see also* Dkt. No. 139, Part 5 [Ex. N to Plf.'s Suppl. Affid., attaching letter dated *10/18/02* from Dr. Curtis S. Fullmer to Undersheriff Randy Haas, stating that (1) the letter constituted Dr. Fullmer's complaint to Undersheriff Haas against Defendant Freshwater regarding the incident that occurred at his home on 3/5/00 involving his very good friend and house guest, Ms. Myer-Foland, (2) in the summer of 2001 he filed a complaint with Defendant Meskill regarding the same subject, and (3) "[y]ou will recall that I *attempted* to register my complaint with you[] approximately one week after the incident and that my attorney *ended the interview* when you requested specific information with regard to the incident."] [emphasis added], *accord*, Dkt. No. 139, Part 5, ¶¶ 6, 8, 11 [Ex. R to Plf.'s Suppl. Affid., attaching undated Affidavit of Dr. Fullmer].)

[85]    (Dkt. No. 139, Part 5, ¶ 3 [Ex. M to Plf.'s Suppl. Affid., attaching Affidavit of Joseph Vitale]; *see also* Dkt. No. 58, Part 6, ¶¶ 6, 12 [Meskill Affid., stating that Defendant Freshwater has always served "with professionalism and distinction" as a Deputy in the Tompkins County Sheriff's Department, and that "I have no reason to believe that Deputy Freshwater has ever used excessive force in affecting an arrest."].)

that has occurred giving rise to a claim of excessive force against Defendant Freshwater (other than the April 8, 2000, incident giving rise to Plaintiff's claim in the current action).[86]  Finally, since Defendant Meskill took office as Sheriff of Tompkins County (on January 1, 1999), and apparently since 1995, there has been never been any judgment entered against the Tompkins County Sheriff's Department or any of its members for excessive force.[87]

Having recited the material facts that are not in dispute, it is appropriate to state that I agree with Plaintiff that it is unclear from the record whether, by the date of the incident in April of 2000, Defendant Meskill had in place, and Defendant Freshwater received a copy of, a departmental use-of-force policy.  This is because the factual assertions and exhibits offered by Defendants on the issue of a use-of-force policy fail to indicate the date or dates on which that policy was created by Defendant Meskill and promulgated to Defendant Freshwater.[88]  I note that the record does contain an assertion by defense counsel indicating that the use-of-force policy

---

[86]    (Dkt. No. 139, Part 5, Ex. M [Vitale Affid.]; *see also* Dkt. No. 58, Part 6, ¶¶ 6, 13 [Meskill Affid.]; Dkt. No. 139, Part 5 [Ex. S to Plf.'s Suppl. Affid., portion of transcript of deposition of Defendant Meskill, indicating that he referred investigation of Ms. Myer-Foland's complaint to Undersheriff Vitale].)

[87]    (Dkt. No. 58, Part 8, ¶ 10 [Defs.' Rule 7.1 Statement]; Dkt. No. 58, Part 6, ¶¶ 1, 12 [Meskill Affid.]; Dkt. No. 139, Part 5, Ex. M [Vitale Affid.]; Dkt. No. 60, Part 5, ¶ 10 [Plf.'s Rule 7.1 Response, not specifically controverting the asserted facts in any material way and/or not supporting any such denial with a record citation that actually substantiates the denial, only Paragraph 43 of, and Exhibit E to, Plf.'s Affid., which are both inapposite], *accord*, Dkt. No. 139, Part 1, ¶ 10 [Plf.'s Suppl. Rule 7.1 Response, citing Paragraph 52 of Plf.'s Suppl. Affid., which is also inapposite, and Paragraph 53 of Plf.'s Suppl. Affid., which merely asserts that Def. Meskill's testimony with regard to the fact in question is false, which is insufficient to create an issue of fact on a summary judgment motion].)

[88]    (Dkt. No. 58, Part 1, ¶ 8 [Freshwater Affid.]; Dkt. No. 58, Part 6, ¶¶ 10-12 [Meskill Affid.]; Dkt. No. 58, Part 7 [Exs. A and B to Meskill Affid.].)

contained in the record was "in effect at the time of the incident."[89]  However, this assertion by

defense counsel does not constitute evidence for purposes of Defendants' motion for summary

judgment, since it does not come in the form of sworn testimony by a witness with personal

knowledge of the facts in question.

### 3.    Discussion

Here, I can find no evidence in the record from which a rational fact finder could base a

conclusion that, assuming a violation of Plaintiff's constitutional rights occurred, such a violation

resulted from a municipal *custom or policy*.

In opposing Defendants' motion requesting dismissal of Plaintiff's claims against the

municipal Defendants, Plaintiff submits a barrage of legal arguments on the issue of municipal

liability (contained in a total of 20 pages in his memorandum of law and his supplemental

memorandum of law).  (Dkt. No. 60, Part 1, at 18-24 [Plf.'s Mem. of Law]; Dkt. No. 139, Part 2,

at 9-21 [Plf.'s Supp. Mem. of Law].)  Although these legal arguments are neatly organized into

separate headings and often supported by case citations, many of them are redundant, off-topic

and, frankly, confounding.  (*Id*.)  I repeat that there are only <u>four</u> ways that a plaintiff may

demonstrate a *policy, custom or practice* for purposes of establishing municipal liability: (1) a

formal policy officially endorsed by the municipality; (2) actions taken by government officials

responsible for establishing municipal policies related to the particular deprivation in question;

(3) a practice so consistent and widespread that it constitutes a *custom or usage* sufficient to

---

[89]      (Dkt. No. 139, Part 5, ¶ j [Ex. L to Plf.'s Suppl. Affid., attaching a letter from defense counsel to Plf. regarding, *inter alia*, Defs.' response to Plf.'s Interrogatory No. 9 to Defendant County]; *see also* Dkt. No. 55, Part 3 at 17 [Ex. A to Plf.'s First Motion to Compel Discovery, attaching Plf.'s Interrogatory No. 9 to Defendant County].)

impute constructive knowledge of the practice to policymaking officials; or (4) a failure by policymakers to train or supervise subordinates to such an extent that it amounts to *deliberate indifference* to the rights of those who come in contact with the municipal employees.

> ### i.     First Method of Demonstrating Policy, Custom or Practice

With regard to the first method of demonstrating a policy, custom or practice, Plaintiff has pointed to no record evidence of a formal policy authorizing or encouraging the use of excessive force during arrests that was officially endorsed by Defendant Tompkins County. Plaintiff appears to acknowledge that there was no such *written* policy.[90]  Rather, Plaintiff argues that there was an *unwritten* policy of "tolerating and encouraging" the use of excessive force, as evidenced by (1) the fact that Defendants are unable to point to any specific use-of-force training that Defendant Freshwater received at the Tompkins County Sheriff's Department prior to the incident in question, and (2) the (alleged) fact that, before the incident in question, the municipal Defendants had notice of charges that Sheriff's Deputies had used excessive force during arrests, but had repeatedly failed to make meaningful investigation into those charges.[91]

As an initial matter, Plaintiff acknowledges that, if such a policy or custom existed, it was an "unofficial" one, which, of course, is insufficient to render municipal defendants liable for actions by police officers, since, as explained above in Part II.B.1. of this Report-

---

[90]  (*See*, *e.g.*, Dkt. No. 60, Part 1, at 22 [Plf.'s Mem. of Law, stating, "Although there may have been no written policy concerning the use of excessive force at the time of the incident, it is evident a blind eye was turned to Freshwater and his history of the use of excessive force and outrageous conduct."].)

[91]  (Dkt. No. 139, Part 2, at 9-18 [Plf.'s Supp. Mem. of Law].)

Recommendation, the policy or custom must be an "official" one.[92]  However, there are more grave problems with Plaintiff's argument.

The most serious problem with Plaintiff's <u>first</u> argument (regarding the alleged lack of use-of-force training of Defendant Freshwater by the municipal Defendants) is that it ignores the fact that the inference that a policy existed authorizing or encouraging the use of excessive force may be drawn from proof that a municipality failed to train its employees *only* where that failure to train was *so egregious* that it reflects a deliberate or conscious indifference to the constitutional rights of those within its jurisdiction.  *See City of Canton v. Harris*, 489 U.S. 378, 388-392 (1989).  In determining whether a failure to train is so egregious, a plaintiff must show (1) that the municipality knows "to a moral certainty" that its employees will confront a given situation, (2) either that the situation presents the employee with a difficult choice that would be made less difficult through training or that there is a history of employees mishandling the situation, and (3) that the wrong choice by the employee will frequently cause the deprivation of a citizen's constitutional rights.  *See Walker v. City of New York*, 974 F.2d 293, 297-298 (2d Cir. 1992).

Here, Plaintiff has adduced no evidence showing that the municipal Defendants knew "to a moral certainty" that Deputy Sheriffs would confront the situation in which a suspect ordered to turn around and place his hands on his head would suddenly lower his hands while slipping on a

---

[92]      (Dkt. No. 139, Part 2, at 18 [Plf.'s Supp. Mem. of Law, arguing, "The above-noted issues . . . exhibit that Meskill and TCSD's deliberate indifference created an *unofficial* policy tolerating and encouraging the use of excessive force by deputies, particularly Freshwater, which ultimately [led] to the violation of Plaintiff's constitutional rights."] [emphasis added].)

patch of ice and/or try to run toward a Deputy Sheriff and then toward his police vehicle.[93]

Even if Plaintiff had adduced such evidence, he has not adduced any evidence that the situation in question presented Defendant Freshwater with "a difficult choice," especially with respect to his reaction to Plaintiff trying to run toward him and then toward his police vehicle. (What else was Defendant Freshwater to do other than restrain Plaintiff, who admits that he continued to struggle until he was subdued?)  Even if the situation in question did present Defendant Freshwater with a "difficult choice," it is hard to imagine what specific use-of-force training the municipal Defendants could have given Defendant Freshwater that (1) would have made this "difficult choice" less difficult and (2) he had not already received before starting work at the Tompkins County Sheriff's Department.  As stated above in Part II.B.2. of this Report-Recommendation, it is uncontroverted that, before starting work as a Tompkins County Deputy Sheriff in January of 2000, Defendant Freshwater had graduated from Basic Police Academy in 1994, completed a "General Topics" Police Instructor Course in September of 1995, received a Certificate of Commendation regarding DWI arrests in February of 1998, completed a Police

---

[93]      *See Meija v. City of New York*, 228 F. Supp.2d 234, 248 (E.D.N.Y. 2002) (no "moral certainty" that employees would confront situation involving a controlled *pickup* of drugs, even though employees had in "a dozen or so" other situations participated in controlled *deliveries* of drugs, since controlled deliveries of drugs were "significantly" different from controlled pickup of drugs); *Bisignano v. Harrison Cent. Sch. Dist.*, 113 F. Supp.2d 591, 601 (S.D.N.Y. 2000) (no "moral certainty" that teacher would lock student in unlit storage closet as punishment even though plaintiffs offered evidence in which teacher had on three occasions behaved inappropriately with students, one in which she threatened to lock a student in a room as punishment); *East Coast Novelty Co. v. City of New York*, 809 F. Supp. 285, 300 (S.D.N.Y. 1992) ("[W]hile the problem of illegal fireworks in New York City recurs with the predictable frequency of the Fourth of July, the Chinese New Year, and other holiday celebrations, East Coast's claim does not rise to the level of alleging that the District Attorney knew 'to a moral certainty' that his employees would confront the unique situation which arose in Newburgh on April 25, 1989 [involving the wrongful seizure and destruction of entire inventory of fireworks pursuant to police operation].").

Field Training Officer Course in February of 1999, and worked for more than six years as a

Cortland City Police Officer.

Nor has Plaintiff adduced any evidence that, before the incident in question, there had

been a "history of employees" of the Tompkins County Sheriff's Department mishandling "such

situations." As stated above in Part II.B.2. of this Report-Recommendation, it is undisputed that

(1) between January 1, 1999 (when Defendant Meskill started working as the Tompkins County

Sheriff) and the incident in question on April 8, 2000 (and apparently between *1995* and April 8,

2000), there had never been a judgment entered against an employee of the Tompkins County

Sheriff's Department for excessive force, and (2) between January of 2000 (when Defendant

Freshwater started working as a Tompkins County Deputy Sheriff) and the incident in question

on April 8, 2000, there had been only one incident that eventually gave rise to an excessive force

claim against Defendant Freshwater. However, it is undisputed that the municipal Defendants

did not receive a Notice of Claim regarding Ms. Myer-Foland's claim of excessive force against

Defendant Freshwater until at least twelve days *after* the occurrence of the incident in question.

Even assuming that, before April 8, 2000, the municipal Defendants knew the details of Ms.

Myer-Foland's claim (which alleged that Defendant Freshwater used excessive force while

responding to a 911 call for medical assistance for an "incapacitated" woman while she was lying

in a friend's backyard), such evidence hardly constitutes evidence of "a history of employees" of

the Tompkins County Sheriff's Department mishandling "such situations." Moreover, Tompkins

County Undersheriff Joseph Vitale "investigated the allegations of that complaint at the time they

were made and found them to be without merit."

The most serious problem with Plaintiff's <u>second</u> argument (regarding the alleged lack of

a meaningful investigation into charges that Defendant Freshwater had used excessive force before the incident in question), is that it either completely disregards the timing that the municipal Defendants acquired notice of those charges, or it disregards the fact that the municipal Defendants in fact investigated those charges and concluded that they were without merit.

As for the timing that the municipal Defendants acquired notice of Ms. Discenza's charge against Defendant Freshwater, as explained above in Part II.B.2. and note 80 of this Report-Recommendation, it is undisputed that, before Defendant Freshwater was hired as a Tompkins County Deputy Sheriff in January of 2000, the municipal Defendants performed a background investigation regarding his qualifications to serve as a Tompkins County Deputy Sheriff, but they did not learn of any problems involving Defendant Freshwater, including the *Discenza v. City of Cortland* legal action then-pending against him. Indeed, Plaintiff expressly argues that, during their background investigation of Defendant Freshwater, the municipal Defendants had "fail[ed]" to discover the *Discenza v. City of Cortland* legal action then-pending against Defendant Freshwater.[94] Having had no notice of the excessive force charge made in that legal action, the municipal Defendants cannot be said to have "failed" to investigate the merits of that charge (for purposes of a municipal liability analysis).

As for Ms. Myer-Foland's charge, even assuming that the municipal Defendants knew the details of Ms. Myer-Foland's claim *before* April 8, 2000, it is undisputed that Tompkins County Undersheriff Joseph Vitale investigated the allegations of that complaint at the time they were made and concluded that they were without merit. With regard to the issue of whether a

---

[94]     (Dkt. No. 139, Part 2, at 9-10 [Plf.'s Supp. Mem. of Law].)

municipality's failure to adequately investigate a single charge of excessive force could ever evidence a municipal "custom" or "practice," I find that it could not, due to the fact that the word "custom" or "practice" carries a connotation that there has occurred a *series* of incidents.[95]  With regard to the issue of whether a municipality's failure to adequately investigate a single charge of excessive force could ever evidence a municipal "policy," it appears that a municipality's *inadequate* investigation of a *single* charge of excessive force may conceivably evidence the existence of a widespread municipal *policy* authorizing the use of excessive force; however, it appears that such an investigation may constitute such evidence only where, *inter alia*, there was a *conscious* choice by a municipal policymaker (i.e., a choice from among various alternatives) to conduct an investigation that was so inadequate as to be *unlawful*.[96]  Here, Plaintiff has adduced

---

[95]      *See Kern v. City of Rochester*, 93 F.3d 38, 44 (2d Cir. 1996) (affirming district court's granting of motion to dismiss filed by city, and denial of motion to amend filed by plaintiff, because plaintiff's allegation that city knew of its fire department lieutenant's "womanizing" and harassment of women before he raped plaintiff failed to state a discriminatory practice that was so "persistent and widespread" as to rise to the level of a municipal "custom or usage"), *cert. denied*, 520 U.S. 1155 (1997); *Saleh v. City of Buffalo*, 97-CV-0872, 1998 WL 135830, at *1, 4, 5 (W.D.N.Y. 1998) (denying plaintiffs' motion for a preliminary injunction because, in part, even assuming truth of plaintiffs' allegations that six police officers conducted about 25 unlawful searches, seizures and arrests at 17 delicatessens owned and/or operated by plaintiffs over a one-year period, that "evidence" would be insufficient to support a finding that "the unlawful conduct complained of by the plaintiffs is 'so persistent and widespread' as to constitute a municipal custom"); *see also Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) ("Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy."); *McConney v. Houston*, 863 F.2d 1180, 1184 (5th Cir. 1989) ("Sufficiently numerous prior incidents . . . may tend to prove a custom and accession to that custom by the municipal policymakers.  Isolated instances, on the other hand, are inadequate to prove knowledge and acquiescence by policymakers.").

[96]      *See Pembaur v. Cincinnati*, 475 U.S. 469, 483 (1986) ("In [*Owen v. City of Independence*, 445 U.S. 622 (1980) and *Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981)], municipal liability attached [based on] a single decision to take unlawful action made by municipal policymakers.  We hold that municipal liability under § 1983 attaches where–and only

no evidence that the way the investigation of Ms. Myer-Foland's charge of excessive force was conducted was a *conscious* decision of either of the municipal Defendants.[97]   Furthermore, Plaintiff has adduced no evidence that the Myer-Foland investigation was so inadequate as to be unlawful or constitutional.

---

where–a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question."); *Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985) ("'[P]olicy' generally implies a course of action consciously chosen from among various alternatives. . . .  And . . . some limitation must be placed on establishing municipal liability through policies that are not themselves unconstitutional."); *cf. City of Canton v. Harris*, 489 U.S. 378, 388 (1989) (discussing the "deliberate choice" standard governing "failure to train" claims); *see also Sarus v. Rotundo*, 831 F.2d 397, 402 (2d Cir. 1987) ("[A]bsent more evidence of supervisory indifference . . . a policy may not ordinarily be inferred from a single incident of illegality.").

[97]      In particular, I reject Plaintiff's implicit argument that the existence of a municipal policy authorizing the use of excessive force is evidenced by the fact that Defendant Meskill accepted Undersheriff Vitale's investigative findings (which were allegedly based on an inadequate or biased investigation).  *See St. Louis v. Praprotnik*, 485 U.S. 112, 130 (1988) ("Simply going along with discretionary decisions made by one's subordinates . . . is not a delegation to them of the authority to make policy. . . . [T]he mere failure to investigate the basis of a subordinate's discretionary decisions does not amount to a delegation of policymaking authority, especially where . . . the wrongfulness of the subordinate's decision arises from a retaliatory motive or other unstated rationale.").  Similarly, Plaintiff's argument that the municipal Defendants "ratified" Undersheriff Vitale's investigative report is unavailing.  (Dkt. No. 139, Part 2, at 15 [Plf.'s Supp. Mem. of Law].)  As articulated by the Supreme Court in *St. Louis v. Praprotnik*, municipal defendants "ratify" a subordinate's decision where (1) that decision is "subject to review" by the municipality's authorized policymakers, i.e., the authorized policymakers have "retained the authority to measure the [subordinate's] conduct for *conformance with their policies*," and (2) the authorized policymakers "approve [the] subordinate's decision *and the basis for it*." 485 U.S. 112, 127 (1988) [emphasis added].  Here, Plaintiff has adduced no evidence in support of either of these two conditions for "ratification."  Rather, the sole evidence in the record indicates that Undersheriff Vitale, in conducting an investigation into Ms. Myer-Foland's charge of excessive force, was performing a duty in which he was given *discretion*, and his *ultimate conclusion* was simply relied upon by the municipal Defendants.

ii.      **Second Method of Demonstrating Policy, Custom or Practice**

With regard to the second method of demonstrating a policy, custom or practice, Plaintiff has pointed to no record evidence of *actions* taken by the municipal Defendants (or other government officials responsible for establishing municipal policies relating to the use of force by Sheriff's Deputies during arrests) that can be said to have *caused* the use of excessive force alleged in this action.  I do not even read Plaintiff's papers as advancing such an argument. Rather, taken in their totality, Plaintiff's papers argue either that his injuries were the result of actions taken by Defendant Freshwater or a reckless lack of action (i.e., a deliberate indifference) on the part of the municipal Defendants.

Indeed, on various occasions, Plaintiff appears to argue that Defendant Freshwater's actions *violated* Defendant Meskill's use-of-force policy.[98]  Similarly, on various occasions, Plaintiff argues that the appropriate Shift Commander, Division Captain and/or Undersheriff violated Defendant Meskill's policy regarding the reporting of incidents in which force was used by failing to prepare a "use of force form" and/or a "use of pepper spray form."[99]  These

---

[98]      (*See, e.g.*, Dkt. No. 139, Part 1, ¶ 8 [Plf.'s Rule 7.1 Response, stating, "The policy specifically states that excessive force shall <u>not</u> be used in affecting an arrest."] [emphasis in original]; Dkt. No. 139, Part 3, ¶ 51 [Plf.'s Suppl. Affid., quoting part of Defendant Meskill's use-of-force policy and then describing how Defendant Freshwater's actions allegedly did not comply with that policy].)  I cannot help noting that, when Plaintiff characterizes Defendant Meskill's use-of-force policy, he repeatedly and conveniently fails to quote Section F.1. of that policy, which, in conjunction with Section C.6. of that policy, appears to govern (and arguably authorize) Defendant Freshwater's use of his flashlight to strike Plaintiff on the head when Plaintiff moved his arms suddenly in the dark of night after misrepresenting his identity to Defendant Freshwater and being told by him to turn around and place his hands on his head. (*See, e.g.*, Dkt. No. 139, Part 3, ¶ 51 [Plf.'s Suppl. Affid.]; Dkt. No. 58, Part 7 [Ex. B to Meskill Affid., attaching Policy & Procedure 209 regarding the Use of Force].)

[99]      (*See, e.g.*, Dkt. No. 139, Part 2, at 14 [Plf.'s Suppl. Affid.]; Dkt. No. 58, Part 7, ¶¶ G, H [Ex. B to Meskill Affid., attaching Policy & Procedure 209 regarding the Use of Force].)

arguments appear to concede that it was not *Defendant Meskill's* actions that caused Plaintiff's injuries, but that it was the actions of other persons (in violation of Defendant Meskill's policies) that caused Plaintiff's injuries.

Although Plaintiff would likely respond that Defendant Meskill took "action" by turning a blind eye to the actions or failures of subordinates, I find that such an argument more properly goes to arguably supporting the <u>fourth</u> method of demonstrating a policy, custom or practice (i.e., a failure by policymakers to train or *supervise* subordinates to such an extent that it amounts to *deliberate indifference* to the rights of those who come in contact with the municipal employees).

### iii.   Third Method of Demonstrating Policy, Custom or Practice

With regard to the third method of demonstrating a policy, custom or practice, Plaintiff has pointed to no record evidence of a practice of using excessive force during arrests that was so consistent and widespread in the Tompkins County Sheriff's Department that it constituted a *custom or usage* sufficient to impute constructive knowledge of the practice to policymaking officials such as Defendant Meskill.

As stated above in Part II.B.2. of this Report-Recommendation, it is undisputed that (1) between January 1, 1999 (when Defendant Meskill started working as the Tompkins County Sheriff) and the incident in question on April 8, 2000 (and apparently between *1995* and April 8, 2000), there had never been a judgment entered against an employee of the Tompkins County Sheriff's Department for excessive force, and (2) between January of 2000 (when Defendant Freshwater started working as a Tompkins County Deputy Sheriff) and the incident in question on April 8, 2000, there had been only one incident that eventually gave rise to an excessive force claim against Defendant Freshwater.  For the same reasons as stated in Part II.B.3.i. of this

Report-Recommendation, I find that this sole incident was insufficient to place the municipal Defendants on constructive notice of an (alleged) Department-wide custom or usage of using excessive force.

I note that Plaintiff also argues that "a year after the incident with [Plaintiff], Freshwater used his vehicle to run down a run-away youth and trap[] him between his car's bumper and a guardrail."[100]   However, the newspaper article to which Plaintiff refers in no way suggests that Defendant Freshwater tried to "run down" the youth or that his use of force was excessive. Rather, the article rather clearly states that Defendant Freshwater merely parked his patrol vehicle perpendicular to a guardrail behind a shopping mall, in order to try to cut off the escape route of a 16-year-old, who was about 50 feet away from the patrol vehicle at the time, and was running along the back of the mall.[101]   The 16-year-old, who was a runaway from a group home for troubled adolescents, then chose to try to "run between the guardrail and the bumper of the patrol car, when he was caught between the two."[102]   As a result, he sustained "contusions to his legs."[103]   I am somewhat dismayed by Plaintiff's mischaracterization of the article, and by other instances of his apparent lack of candor with the Court.[104]   In any event, because that incident

---

[100]     (Dkt. No. 60, Part 1, at 19 [Plf.'s Mem. of Law]; Dkt. No. 139, Part 2, at 16 [Plf.'s Supp. Mem. of Law].)

[101]     (Dkt. No. 60, Part 4 [Ex. J to Plf.'s Decl., attaching article from *The Ithaca Journal*, dated 4/24/01, entitled "Teen injured after running into patrol car"].)

[102]     (*Id*.)

[103]     (*Id*.)

[104]     For example, in addition to Plaintiff's repeated and convenient failure to quote Section F.1. of Defendant Meskill's use-of-force policy (discussed above in note 98 of this Report-Recommendation), and his other mischaracterizations of various portions of the record

described in the article happened more than a year after the incident in question, it cannot serve to place the municipal Defendants on constructive notice of such use of excessive force before the incident in question.

### iv.    Fourth Method of Demonstrating Policy, Custom or Practice

With regard to the fourth method of demonstrating a policy, custom or practice, Plaintiff has pointed to no record evidence of a failure by Defendant Meskill (or other municipal policymakers) to train or supervise Defendant Freshwater with regard to the proper use of force during arrests to such an extent that it amounted to *deliberate indifference* to the rights of citizens (such as Plaintiff) who might come in contact with Defendant Freshwater.

Specifically, as for Plaintiff's lack-of-proper-training theory of liability, the legal standard governing that theory of liability is the same legal standard established under *City of Canton v. Harris*, 489 U.S. 378 (1989) and *Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992), as described above in Part II.B.3.iv. of this Report-Recommendation.  As a result, my analysis and conclusion regarding Plaintiff's attempt to try to establish the fourth method of demonstrating a policy, custom or practice (i.e., through deliberate indifference) is the same analysis and conclusion set forth above in Part II.B.3.iv. of this Report-Recommendation.  In short, I find that Plaintiff has adduced no evidence showing that the municipal Defendants knew "to a moral certainty" that the Tompkins County Deputy Sheriffs would confront the situation in which a

---

evidence, I note that he repeatedly states that, as of June 14, 2006, "all of [his] prior [criminal] offenses [were] under collateral attack."  (*See, e.g.*, Dkt. No. 139, Part 3, ¶ 68 [Plf.'s Suppl. Decl.].)  To the contrary, it appears that, as of May 19, 2005, the Fifth Circuit had dismissed his appeal of a district court's dismissal with prejudice of his 28 U.S.C. § 2255 action to vacate one of his several criminal convictions.  *See U.S. v. Tracy*, 04-CV-0130 (S.D. Ind., noting the denial of Plf.'s request for certificate of appealability, and the denial of Plf.'s motion to proceed *in forma pauperis*, both on 5/19/05).

suspect ordered to turn around and place his hands on his head would suddenly lower his hands while slipping on a patch of ice and/or try to run toward a Deputy Sheriff and then toward his police vehicle.  Even if Plaintiff had adduced such evidence, he has not adduced any evidence that the situation in question presented Defendant Freshwater with "a difficult choice," or that, if there was such a "difficult choice," the municipal Defendants could have given Defendant Freshwater any use-of-force training that would have helped him to make that "difficult choice" more than did the training he had already received before starting work at the Tompkins County Sheriff's Department.  Nor has Plaintiff adduced any evidence that, before the incident in question, there had been a "history of employees" of the Tompkins County Sheriff's Department mishandling "such situations."

As for Plaintiff's lack-of-proper-supervision theory of liability, again, the legal standard, my analysis, and my conclusion regarding this theory is as described above in Part II.B.3.iv. of this Report-Recommendation.   In short, Plaintiff completely disregards when the municipal Defendants acquired notice of Ms. Discenza's charge of excessive force against Defendant Freshwater: because no evidence exists that the municipal Defendants had notice of Ms. Discenza's charge before the incident in question (on April 8, 2000), the municipal Defendants cannot be said to have "failed" to investigate the merits of that charge in such a way as to demonstrate their deliberate indifference to Plaintiff's constitutional rights.  Moreover, Plaintiff disregards the fact that the municipal Defendants in fact investigated Ms. Myer-Foland's charge of excessive force against Defendant Freshwater and concluded that it was without merit: the mere fact that Plaintiff offers criticism of the manner in which that investigation was conducted, or of the findings that the investigation yielded, does not mean that the investigation was

unlawful or unconstitutional, or that it was the result of a conscious or deliberate choice by one of the municipal Defendants.

As a result, I recommend that, in the alternative, the Court dismiss Plaintiff's claims against Defendants Meskill and Tompkins County based on the principles of limited liability announced in *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and its progeny.

### 4.      Other Theories of Municipal Liability

Plaintiff also asserts against the municipal Defendants a negligence theory of liability and a theory of vicarious liability.  (*See*, *e.g.*, Dkt. No. 139, Part 2, at 18-21 [Plf.'s Supp. Mem. of Law].)  As for his negligence theory of liability, that theory fails to state a claim upon which relief may be granted, since mere negligence is not actionable under 42 U.S.C. § 1983.[105] Rather, there must be an allegation that Defendants possessed a level of intent equal to or higher than deliberate indifference, which is akin to criminal recklessness.[106]  To the extent that, through this theory, Plaintiff is arguing that the municipal Defendants were not simply negligent but were deliberately indifferent, that argument has already been addressed and rejected above in this Report-Recommendation.

---

[105]      *See*, *e.g.*, *Cole v. NYC Police Dept.*, 94-CV-2070, 1998 U.S. Dist. LEXIS 12430, at *19-21 (E.D.N.Y. Aug. 7, 1998) (rejecting plaintiff's negligent hiring claim against municipality arising out of police officer's alleged use of excessive force against plaintiff, because the legal standard governing that claim did not involve mere negligence, that is the probability of whether the officer would commit such a constitutional violation, but it involved deliberate indifference, that is the high likelihood that he would commit such a violation).

[106]      *See*, *e.g.*, *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment."); *Hemmings v. Gorczyk*, 134 F.3d 104, 108 (2d Cir. 1998) ("The required state of mind [under the Eighth Amendment is] equivalent to criminal recklessness [not negligence] . . . .").

As for his theory of vicarious liability, that theory is also misplaced.  Vicarious liability, also known as liability on the basis of a theory of *respondeat superior*, cannot be imposed on a municipality solely on the basis of the employer-employee relationship.[107]  Rather, as stated above in Part II.B.1. of this Report-Recommendation, to establish municipal liability under § 1983 for unconstitutional acts by a municipality's employees, a plaintiff must show that the violation of his or her constitutional rights resulted from a municipal custom or policy. Plaintiff's personal-involvement analysis is thus either inapplicable or redundant of the policy-or-custom analysis addressed above in this Report-Recommendation.

Finally, I note that, in his papers, Plaintiff occasionally argues that a question of fact has been created sufficient to defeat Defendants' motion because Defendants have failed to produce to him various forms of relevant discovery, for example "discovery concerning any and all complaints or grievances filed against officers of the Tompkins County Sheriff's Department."[108] I find such arguments to be wholly without merit, given the fact that Plaintiff has been extended copious leniency by the Court during discovery, and the fact that (after filing dozens of motions

---

[107]     *See Collins v. City of Harker Heights*, 503 U.S. 115, 122 (1992) ("The city is not vicariously liable under § 1983 for the constitutional torts of its agents: It is only liable when it can be fairly said that the city itself is the wrongdoer."); *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) ("[A] municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue.  *Respondeat superior* or vicarious liability will not attach under § 1983.") [emphasis in original]; *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 691 (1978) ("[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents."); *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983) ("[A] [municipality] may not be held for the actions of its employees or agents under a theory of *respondeat superior*."); *Powell v. Bucci*, 04-CV-1192, 2005 WL 3244193, at *5 (N.D.N.Y. Nov. 30, 2005) (McAvoy, J.) ("A municipality may not be held liable in a § 1983 action for the conduct of a lower-echelon employee solely on the basis of *respondeat superior*.").

[108]     (*See, e.g.*, Dkt. No. 60, Part 1, at 24 [Plf.'s Mem. of Law].)

47

regarding the discovery process) he had been given all the discovery to which he is due under the Federal Rules of Civil Procedure.

**ACCORDINGLY**, it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 58) be **GRANTED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Svcs.*, 892 F.2d 15 [2d Cir. 1989]); 28 U.S.C. § 636(b); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: July 11, 2007
      Syracuse, New York

George H. Lowe
United States Magistrate Judge